UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

Civil Action No.


EDDIE O. MORALES,
Petitioner

v. **04-30191-MAP**

LOIS RUSSO, Superintendent, and
THOMAS F. REILLY, Attorney General,
Respondents


**MEMORANDUM IN SUPPORT OF PETITION
FOR WRIT OF HABEAS CORPUS**


QUESTIONS PRESENTED FOR REVIEW


1.  Did the Massachusetts Supreme Judicial Court make an
    unreasonable determination of facts and an unreasonable
    application of clearly established federal law in concluding
    that the Defendant's constitutional right to trial by an
    impartial jury was not violated where the county was
    saturated with highly inflammatory pretrial publicity?

2.  Did the Massachusetts Supreme Judicial Court make an
    unreasonable determination of facts and an unreasonable
    application of clearly established federal law in concluding
    that the Defendant was not denied his constitutional right
    to remain silent where the prosecutor commented on the
    Defendant's failure to testify?

3.  Did the Massachusetts Supreme Judicial Court make an
    unreasonable determination of facts and an unreasonable
    application of clearly established federal law in concluding
    that the Defendant was not denied his constitutional right
    to present a defense where the police intimidated his
    witnesses, where the media published photographs of the
    jurors, thereby increasing the pressure from the community
    to convict; where one juror ignored the court's instruction
    not to form a conclusion, interfered with the others'
    ability to concentrated and illustrated that at least one
    juror - she - was impartially affected by pretrial

1

publicity, and where the Court admitted the Defendant's threats to kill another person?

4. Did the Massachusetts Supreme Judicial Court make an unreasonable determination of facts and an unreasonable application of clearly established federal law in concluding that the Defendant was not denied his constitutional right to put forward a defense, self-defense where the court refused to ask the potential jurors in voir dire their willingness to accept self-defense, where the prosecutor vouched for his witness on this issue, and where a mistrial should have been declared when a witness's improper testimony struck at the heart of the issue of self-defense?

5. Did the Massachusetts Supreme Judicial Court make an unreasonable determination of facts and an unreasonable application of clearly established federal law in concluding that the trial court did not abuse discretion and deny the Defendant his federal and state constitutional right to a fair trial where the Court admitted the Defendant's threats to kill a person whom he believed to have "snitched"?

6. Did the Massachusetts Supreme Judicial Court make an unreasonable determination of facts and an unreasonable application of clearly established federal law in concluding that the Defendant was not denied his federal constitutional right to a fair trial where one juror ignored the Court's instruction not to form a conclusion, violated the order not to deliberate, and interfered with the others' ability to hear and concentrate?

## STATEMENT OF THE CASE

### Prior Proceedings and Disposition in the State Court

The Defendant, Eddie O. Morales, was indicted on one count of murder. (R. 20.)  Pre-trial, he filed a Motion to Change Venue which was denied.  (R. 3.)  At the Motion hearing, the Commonwealth requested that the hearing be closed and the pleadings impounded to avoid pre-trial publicity.  (R. 21.)

Jury selection took two days of individual voir dire of jurors, and the trial, McDonald, J. presiding, lasted six

2

additional days.   (R. 6.)   The jury returned a verdict of guilty
of first degree murder on grounds of deliberate premeditation and
with extreme atrocity or cruelty, and Morales was sentenced to
incarceration for life.   (Tr. VI/133, 160.)

Morales filed a timely Notice of Appeal.   (R. 230.)   The
Supreme Judicial Court affirmed his conviction on December 11,
2003.

**STATEMENT OF FACTS**

**Pre-Trial Issues**

<u>Publicity: Commonwealth's Request to Close the Suppression
Hearing and Impound the Pleadings</u>

The Commonwealth requested that the hearing on Morales's
pre-trial motions be closed and the pleadings impounded, and
defense counsel argued that the Court lacked authority to close
the court room.   (Tr. M. II/195; III/9.)   The District Attorney
argued that, because the Commonwealth was opposed to a change of
venue, the Commonwealth was "trying to ... do everything we can
to reduce any possible prejudice or any possible information
about the case being broadcast in the media in the hope that we
would be able to try the case here in the county with a Hampden
County jury."   (Tr. M. II/197.)   The Commonwealth argued that
the "contents of the documents are ripe with information that
... would make the issue of a motion for a change of venue a
forgone conclusion."   (Tr. M. III/12, 15.)

The second day of hearing, counsel for the  Springfield

3

Union News filed an Opposition to the Commonwealth's request that the hearing be closed. (Tr. M. III/22; R. 24. ) Counsel for the newspapers told the Court that "banner headlines" reporting that "Manhunt is Over" and "Police Report Confession by Suspect" indicated that the documents had already been disseminated. (Tr. M. III/22, 27.) Defense counsel, too, argued that the "cat is out of the bag" and that the media already had the documents. (Tr. M. III/ 18-19.) He argued that change of venue was necessary regardless of what steps the Court took at the Motion to Suppress stage. (Tr. M. III/19.)

The Court stated that the motions and attachments had been a part of the public record since filing, there may have already been access obtained by the public, and the Court questioned why it was important to impound them now, but not when they were first filed. (Tr. M. III/10.) On October 27, 2000, the Commonwealth withdrew its efforts to have the Motion to Suppress hearing closed. (Tr. M. III/3.)

Publicity: Defendant's Motion to Change Venue

Morales filed an extensive Motion to Change Venue which was denied on November 21, 2000 and its reconsideration denied on November 30, 2000. (R. 37, 197-98; T. M. 113.) To Morales's Memorandum were appended, several inches thick, copies of newspaper articles, and at the Motion hearing, defense counsel produced a large shopping bag filled with dozens of audio and

4

video tapes of television and radio coverage of these events.
(R. 63; Tr. I/49.)

    The news articles reported the following:

On December 27, 1999, five days after the shooting, the Springfield Union News reported that the Defendant had been arrested, and that "it was the first time they heard people shouting horray in a funeral home." (R. 77.)

The Springfield Union News reported that 1,000 people stood for more than an hour in biting wind to pay respects and that 6,000 people were expected to attend DiNapoli's funeral, which was televised throughout the county. (R. 79-80.)

On December 28, 1999, the Springfield Union News reported the Defendant's confession. (R. 87.)

On December 30, 1999, the Boston Herald's headlines read: "Suspect knew DiNapoli was a cop." R. 107.)

On December 30, 1999, the Springfield Union News reported Morales's criminal record with headlines: "Many charges, but little jail time." (R. 118.)

On January 12, 2000, the Springfield Union News reported that Officer DiNapoli's large memorial fund is a "testament to how well-loved John DiNapoli was." (R. 121.)

On January 28, 2000, the Springfield Union News reported that the Holyoke City Council was expected to approve an ordinance which would add decals to all cruisers "WWJDD," which stands for "What Would John DiNapoli Do?" (R. 71.)

On April 27, 2000, the Springfield Union News reported that Officer DiNapoli's name would be added to a memorial, and again the details of case were reprinted. (R. 128.)

On May 6, 2000, the Springfield Union News reported that Officer DiNapoli was being honored in Washington, D.C., that thirty officers were traveling "at their own expense" to attend, and the details of the confession were again reprinted. (R. 131.)

On May 22, 2000, the Springfield Union News ran a story about DiNapoli's daughter' bicycle race in which she

stated, "I had him with me on this ride," and the details of the murder were recanted.  (R. 134.)

On July 25, 2000, the Springfield Union News reported that Morales was awarded "up to $10,000 in public funds to hire experts," and the details were reprinted.  (R. 137.)

On July 27, 2000, the Springfield Union News reported that DiNapoli's son had joined the Holyoke police force.  (R. 141.)  On June 28, 2000, the Springfield Times Union reported that DiNapoli's son was sworn in as a police officer, the chief telling the new officers that "if they did as well as John DiNapoli did over a 30-year career they could be proud." (R. 143.)

Also appended to Morales's Motion for Change of Venue were print-outs from the newspaper's web board which contained comments from newspaper readers such as: "I actually hope he gets off, and screws up again so he can get what he really and truly deserves, AN AUTOPSY!" "$10,000 for defense fund for a two bit piece of garbage maggot with a gold chain that will never change his ways," "He is Puerto Rican TRASH." (R. 147.)

On October 24, 2000, the Springfield Union News reported that at the motion hearing the day before there was "an explosive situation" in the courtroom.  (Tr. M. II/162.)  The newspaper reported that, with a packed courtroom, the victim's daughter "burst into tears" and said "audibly that Morales had made kissing motions at her and her brother..." R. 29).  The Court conducted a brief evidentiary hearing and stated for the record that he had not observed the Defendant's alleged misbehavior.  (Tr. M. II/167.)

Publicity:  Juror Issues

6

On Friday, March 9, the first day of testimony, the local newspaper requested the names and addresses of the jurors. (Tr. III/191.) Both defense counsel and the district attorney objected. (Tr. III/191.) On Monday, March 12, the second day of testimony, the Court was advised that the local newspaper had published photographs of the jurors in the Saturday edition. (Tr. IV/3.) The Court was "extremely distressed." (Tr. IV/3.)

Witness Intimidation

Pre-trial, defense counsel raised the issue of witness tampering. He informed the court that his investigator had been told by two different witnesses that the District Attorney's office told them that they excused and did not have to come to court, regardless of a subpoena. (Tr. M. I/85-86.) One of the defense witnesses received death threats. (Tr. M. I/86.) The state police interfered with defense investigations by taking a witness out of his house in the middle of defense questioning, following which the witness refused to answer defense questions, refused to talk to the defense investigator, and refused to answer telephone calls or the door. (Tr. M. I/92.)

Evidentiary Issue: Admission of Audio Tape

The Court allowed admission into evidence an audio tape over Defense counsel's objections. (Tr. V/8-9.) In it, Morales, while in prison, said to his girlfriend, Brenda, that he would kill his friend, "Flako," (Hector Cabrerra) because he

7

was a snitch.  (R. 216.)

Juror Misbehavior

On March 15 during trial, three jurors complained to the court officer that one juror was expressing  answers to questions before the witnesses answered.  (Tr. VII/151.)  The juror was "rolling her eyes.  She's making head movements, yes, no..."  (Tr. VII/221.)  Another juror complained that the behavior was "troublesome, he can't concentrate..."  (Tr. VII/221.)  A third juror said, "It's very ...[distracting] and I'm having trouble ignoring her and concentrating on the case."  (Tr. VII/221.)  The Clerk reported to the judge that the juror was "mouthing" answers to questions and saying, "No, that's not true" and "That can't be."  (Tr. VII/222.)  The Court grappled with the fact that even though it seemed that the juror was forming conclusions about the case before it was over, whether that inappropriate behavior was disqualifying behavior.  (Tr. VII/155.)  In the end, nothing was done about the juror, and she deliberated.

**The Commonwealth's Case**

On December 22, 1999, Officer John DiNapoli, in plain clothes, gave his best friend and co-worker, Gary Wagner, a ride to juvenile court.  (Tr. III/64.)  Instead of sitting in the unmarked car waiting for Wagner, DiNapoli drove to get money for coffee.  (Tr. III/64.)  Dispatch received a call of a

disturbance at Sargent and Walnut Streets, and DiNapoli radioed that he was right around the corner and he would drive over. (Tr. III/66.)  DiNapoli was driving an unmarked, white Ford Crown Victoria.  (Tr. III/72, 79.)

Manuel Alicea, owner of Manny's Market testified that Morales was in the area of his store "practically every day" in the company of Abner Oquendo or Hector Cabrerra ("Flako").  (Tr. III/119-20.)  On December 22, 1999 at 8:30 a.m., he saw Morales, wearing a camouflage coat and walking down the street with Oquendo.  (Tr. III/116-18, 153; IV/155.)  He noticed that Morales, Oquendo, and another party in a kind of "scuffle argument," and so Alicea called the police.  (Tr. III/121-22.) After a few minutes, a car pulled up, then it "burned rubber backwards," and Alicea lost sight of it.  (Tr. III/124.)

Donald Ryan was a beverage salesman who was making a sales call at Manny's Market on December 22, 1999.  (Tr. III/152-53.) He saw the person in the car talking to two people out of the passenger side window.  (Tr. III/155.)  Morales was walking down the street towards the car, and DiNapoli was attempting to get Morales's attention.  (Tr. III/157-58.)  Morales walked up to the car, looked in the passenger side window, and then ran away. (Tr. III/158, 160.)  He crossed Walnut Street, at which point the officer got out of his car.  (Tr. III/158.)  Then he got back in the car, backed up and chased Morales in his car.  (Tr.

9

III/159.)

Maritza Rivera was sitting on her porch drinking coffee when she saw the white car "going fast," "real fast" turn from Elm Street onto Sargeant Street. (Tr. IV/46, 54-55.) The white car was chasing the man in the camouflage jacket. (Tr. IV/62.) She went to the window and saw the car again on Walnut and Hampshire, this time moving in reverse. (Tr. IV/47.) She saw Morales on Walnut Street pull out his gun and start shooting. (Tr. IV/48.) Rivera ran away from the scene and heard more shots as she was running. (Tr. IV/49.)

Gilbert Febus worked for DSS and was doing a home visit at 217 Hampshire Street on December 22, 1999. (Tr. IV/68.) When he heard gunshots, he looked out of the window and saw a man dressed in camouflage standing on the sidewalk and shooting at the car. (Tr. IV/69, 85.) The officer "tried to put the car in reverse and tried to back up." (Tr. IV/70.)

Daniel Davila was walking down Cabot Street to the bus stop when he observed the unmarked cruiser going the wrong way on Elm Street, a one-way street. (Tr. IV/129-30.) He watched the car go up Elm towards Essex, then continue down Cabot towards Maple and High Street. (Tr. IV/139.) He saw Morales running down Elm Street from Cabot in the other direction. (Tr. IV/130.)

A black handgun, a single action semi-automatic pistol, which held ten bullets, was found in a plastic garbage bag near

10

the corner of Essex and Walnut. (Tr. IV/166, V/55, 68.) Two fingerprints on the handgun were identified as Morales's. (Tr. IV/176.) The Commonwealth's forensic pathologist testified that the cause of death was multiple gunshot wounds. (Tr. IV/196.) Ten discharged casings were recovered from the scene. (Tr. V/35-36; VI/37.) There were ten bullet holes in Officer DiNapoli's car. (Tr. V/61.)

Scranton police officer, <u>Michael Dougherty</u>, testified that on December 27, 1999, he and other members of his department arrested Morales. (Tr. VI/70-72.) In custody, Morales stated that he was on the corner of Sargeant and Walnut Streets in Holyoke selling drugs when a "guy" came up and said, "Give me all you have." (Tr. VI/87.) Morales punched him in the face and left, saying that he would be back. (Tr. VI/87-88.) Morales knew where "someone" kept a gun, so he went to get it and returned to the corner. (Tr. VI/88.) A white car pulled up, and the driver pointed at Morales and said, "Stop right there." (Tr. VI/88.) Morales ran down Sargeant Street into an alley, and "the guy" was coming after him. (Tr. VI/88.) Morales shot at the driver of the car at the front window, from about twenty feet away. (Tr. VI/88.) Morales dropped the gun and ran. (Tr. VI/89.) In his statement to the Scranton police, Morales said, "I am sorry for what happened. I didn't know he was a cop. It was the first time I had a gun in my hand, and if

11

I have to pay ... pay with my life, I will to give a little compassion to the family.  I just got nervous."  (Tr. VI/ 91.)

Massachusetts state trooper <u>John G. Murphy</u> was dispatched to Scranton on December 27, 1999, and he questioned Morales from 11:45 p.m. until 1:16 a.m.  (Tr. VI/151; VII/35, 70.)  Trooper Murphy was so distraught on the stand that he could not finish reading Morales's statement to the jury, so the District Attorney read: "[T]he white car stopped and that guy in the car pointed at me and said, 'Stop right there.'  I thought it was a cop, so I started running.  I can't remember so well what he looked like....  I was running down the alley and when I was in the middle of the alley, the white car was coming behind me..."  (Tr. VI/190.)  Morales said that the car was right behind him in the alley.  (Tr. VI/191.)

**The Defense Case**

<u>Wilfredo Arturet</u> testified that on December 22, 1999  he was driving up Sargeant Street when he saw the Crown "Cristoria" [sic] going down the alleyway.  (Tr. VII/181.)  He saw Morales running, and when he was running back up Walnut Street, the car went into reverse.  (Tr. VII/183.)  Morales was running in the direction of the car when the car wen into reverse and "in an angle" to follow Morales down Hampshire Street.  (Tr. VII/184.)  It looked like the car was trying to cut him off so he could not

run past it.  (Tr. VII/184-85.)  Then Morales began shooting.
(Tr. VII/185.)  Elba Rueda looked out of her window when she
heard shots and saw someone shooting at a white car.  (Tr.
VII/196.)  She called 911, but she did not know if it was a
police car or a regular car.  (Tr. VII/197.)  Juan Antonetty was
in the laundromat when he saw the shooting.  (Tr. VII/202.)  He
saw that the car was parked and that it was blocking the street.
(Tr. VII/207.)  The parties stipulated that Morales's girlfriend
told him on the day of the shooting that the victim was a police
officer.

## Improper Closing Argument

In closing, the prosecutor argued that "... if it was self-
defense, you would think he would want to tell the truth about
how the shooting actually happened.  If he's acting in self-
defense, then isn't he ... going to want to say the truth about
how the shooting happened?"  (Tr. VIII/66.)

### STANDARD OF REVIEW

Because the underlying habeas petition was filed after
April 24, 1996, the Anti-terrorism and Effective Death Penalty
Act ("AEDPA") Controls.  Lindh v. Murphy, 521 U.S. 320, 322, 336
(1997).  The AEDPA, Pub. L. No.104-132, 110 Stat. 1214 (1996),
allows a federal court to grant habeas corpus relief where the
state court adjudication was based on an "unreasonable

determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. 2254(d)(2). "[A] determination of a factual issue made ... shall be presumed to be correct," unless the petitioner is able to "rebut the presumption of correctness by clear and convincing evidence." 28 U.S.C. 2254(e)(1). Subsection 2254(e)(2) applies exclusively to determinations of basic, primary or historical facts, Sanna v. Dipaolo, 265 F.3d 1, 7 (1st Cir. 2001), not to mixed questions of fact and law, which are more amenable to analysis under section 2254(d)91). Dollinger v. Hall, 302 F.3d 5, 8 n.5 (1st Cir. 2002); Ouber v. Guarino, 293 F.3d 19, 27 (1st Cir. 2002).

The AEDPA allows habeas relief if the state court decision involved an unreasonable application of clearly established federal law, as determined by the Supreme Court of the United States. 28 U.S.C. 2254(d)(1). A state court's decision is an "unreasonable application" of clearly established federal law where the federal habeas court find that the "state court correctly identified the governing legal principle from [this Court's] decisions bu7t unreasonably applied it to the facts of the particular case." Williams v. Taylor, 529 U.S. 362, 405, 412-13 (2000). A federal habeas court "should ask whether the state court's application of clearly established federal law was objectively unreasonable." Id. At 409, Ouber, 293 F.3d at 31.

14

## ARGUMENT

I.   THE MASSACHUSETTS SUPREME JUDICIAL COURT MADE AN
     UNREASONABLE DETERMINATION OF FACTS AND AN UNREASONABLE
     APPLICATION OF CLEARLY ESTABLISHED FEDERAL LAW IN FINDING
     THAT THE DEFENDANT WAS NOT DENIED HIS CONSTITUTIONAL RIGHT
     TO TRIAL BEFORE AN IMPARTIAL JURY WHERE THE COUNTY WAS
     SATURATED WITH  EXTENSIVE, INFLAMMATORY PRETRIAL PUBLICITY.

The Sixth Amendment guarantees a criminal defendant the
right to a trial before an impartial jury.  A criminal
defendant's right to a fair trial is the "most fundamental of
all freedoms." Estes v. Texas, 381 U.S. 532, 540 (1965).  The
right to an impartial jury is intrinsically related to the
concept that an accused is presumed innocent until proven
guilty.  See Irwin v. Dowd, 366 U.S. 717 (1961).
Although the existence of pretrial publicity does not alone
indicate that an impartial jury cannot be impaneled, the
question is whether there are "any indications in the totality
of the circumstances that [a defendant's] trial was not
fundamentally fair." Murphy v. Florida, 421 U.S. 794, 799
(1975).

Here, Morales was denied his constitutional right to a fair
trial before an impartial jury because the pre-trial publicity
was pervasive and relentless, it was highly inflammatory, the
entire jury pool was exposed to it, the court's voir dire
examination was inadequate to determine partiality, defense
counsel had to accept some jurors "reluctantly" in an effort to

15

achieve a fair and representative cross section, almost sixty per cent of the jury was excused by the Court on varying bases of partiality, indicating statistically that the seated jury was partial, and the trial court abused in not changing venue.

In Rideau v. Louisiana, 373 U.S. 723 (1963), the Supreme Court held that it was a denial of due process to refuse the defendant's request for change of venue where his confession had been televised. The Court reasoned, "For anyone who has ever watched television the conclusion cannot be avoided that this spectacle, to the tens of thousands of people who saw and heard it, in a very real sense *was* [the] trial... Any subsequent court proceedings in a community so pervasively exposed to such a spectacle could be but a hollow formality." Id. at 726 (emphasis in original).

Hampden county was saturated with media coverage of this case. "To satisfy his burden even in such sensational cases, the petitioner must ... demonstrate that the populace from which his jury was drawn was widely infected by a prejudice apart from mere familiarity with the case. Where, as here, the petitioner relies solely upon the inflammatory details and tenor of particular newspaper articles as the seeds of that prejudice, he must evince some indication of the ambit of the dissemination of this poisonous palaver." Mayola v. Alabama, 623 F.2d 992, 999

16

(5th Cir. 1980).  Here, the ambit of the dissemination was to virtually every household.  The Telegram and Gazette newspapers reached 147,000 readers in the area, and the Springfield Union News-Sunday Republican reached 136,000.  (R. 175-76.)  Hamden county has a total population of 456,310, and Springfield has 57,769 households.  (R. 178, 181.)  It is, thus, fair to say that the three newspapers' combined circulation of 283,000 was extensive in terms of the potential jury pool in Hamden county. In addition, all of the local television stations carried repeated coverage of the shooting, the massive manhunt, and the arrest, with pictures of the vehicle with numerous bullet holes in the windshield.  In short, the name, "Eddie Morales," quickly became a household word.

Every day the story appeared on the front page of the newspapers, accompanied by very large headlines, describing the "Cop Killer."  The confession was reported in newspapers in the days following the arrest, prior to the Suppression hearing, and just before the trial began.  (R. 87.)  As in Rideau, the people of Hampden county "had been exposed repeatedly and in depth to the spectacle of [the Defendant] personally confessing in detail to the crimes with which he was later to be charged."  Rideau, 373 U.S. at 726.  In addition to the confession, Morales's criminal history was reprinted in the newspaper and publicized

17

on television.  (R. 118.)   One headline sensationalized Morales's past as "Many charges, but little jail time."  In Marshall v. United States, 360 U.S. 310 (1959), the Supreme Court set aside a conviction where as here jurors were exposed "through news accounts" to information that was not admitted at trial.

The Commonwealth's attempts to close the pre-trial motion hearing and impound the pleadings illustrates that everyone realized just how pervasive the dissemination of the details of the case was pre-trial.  The Commonwealth argued that the "contents of the [suppression] documents are ripe with information that ... would make the issue of a motion for a change of venue a forgone conclusion."  (Tr. M. III/12, 15.) But the information had already been disseminated at that point, and as argued by counsel for the newspaper at the suppression hearing, the Court was being asked to put the "toothpaste back into the tube."  (Tr. M. III/22.)

Recent studies have proven that the more pretrial media exposure, the more likely a person is to know about a given case; the more a person knows about a given case, the more likely that person is to form a biased opinion against the defendant; and although other non-media factors may play a role, pretrial publicity is the most serious cause of juror bias.  S.

Krause, <u>Punishing the Press: Using Contempt of Court to Secure the Right to a Fair Trial</u>, 76 B.U.L. Rev. 537, 560 (1996), *citing* E. Constanti & J. King, <u>The Partial Juror: Correlates and Causes of Prejudgment</u>, 15 Law & Soc. Rev. 9, 11 (1981).

The media coverage here was far-reaching, unrelenting, and saturating. "Where a petitioner adduces evidence of inflammatory, prejudicial pretrial publicity that *so pervades or saturates the community as to render virtually impossible a fair trial by an impartial jury drawn from the community,* '[jury] prejudice is presumed and there is no further duty to establish bias.'" <u>Mayola v. Alabama</u>, 623 F.2d 992, 997 (5th Cir. 1980), *quoting* <u>United States v. Capo</u>, 595 F.2d 1086, 1090 (5th Cir. 1979), *cert. denied*, 444 U.S. 1012 (1980)), emphasis added. And, here, in addition to the extent of the pretrial publicity, it was particularly inflammatory and unfairly prejudicial.

This case is similar to <u>Coleman v. Kemp</u>, 778 F.2d 1487 (11th Cir. 1985) where the Eleventh Circuit Court of Appeals held that pretrial publicity was so inflammatory and prejudicial as to make a fair trial before an impartial jury impossible. "Prejudice is presumed from pretrial publicity when pretrial publicity is sufficiently prejudicial and inflammatory and the prejudicial pretrial publicity saturated the community where the trial[] [was] held." <u>Id</u>. at 1490. *See also* <u>United States v.</u>

McNeill, 728 F.2d 5, 9 (1st Cir. 1984); Murphy v. Florida, 421 U.S. 794, 802 (1975).

In Coleman, as here, a small rural community, experienced a brutal killing.  There, the victims were an innocent family; here, the victim was a very beloved and widely known police officer.  The Springfield Union News reported that 6,000 people attended Officer DiNapoli's funeral and that 1,000 people stood for more than an hour "in biting wind" to pay their respects.  (R. 79-80.)  On January 12, 2000, the Springfield Union News reported that Officer DiNapoli's large memorial fund is a "testament to how well-loved John DiNapoli was."  (R. 121.)  On January 28, 2000, the Springfield Union News reported that the Holyoke City Council was expected to approve an ordinance which would add decals to all cruisers "WWJDD," which stands for "What Would John DiNapoli Do?"  (R. 71.)  On April 27, 2000, the Springfield Union News reported that Officer DiNapoli's name would be added to a memorial, and the details of case were again reprinted.  (R. 128.)  On May 6, 2000, the Springfield Union News reported that Officer DiNapoli was being honored in Washington, D.C., that thirty officers were traveling "at their own expense" to attend, and the details of the confession were again reprinted.  (R. 131.)

Human interest stories daily kept Officer DiNapoli's name

before Hampden County: "Friend's Death Led Patrolman to Join Force." (R. 64.) On June 28, 2000, the Springfield Times Union reported that DiNapoli's son was sworn in as a police officer, the chief telling the new officers that "if they did as well as John DiNapoli did over a 30-year career they could be proud." (R. 141.) On July 27, 2000, the Springfield Union News reported that DiNapoli's son had joined the Holyoke police force. (R. 141.) And, on May 22, 2000, the Springfield Union News ran a story about DiNapoli's daughter' bicycle race in which she stated, "I had him with me on this ride," and the details of the killing were again recanted. (R. 134.)

In stark contrast, Morales was repeatedly vilified in the press. When he was arrested, the Springfield Union News reported that "it was the first time they heard people shouting horray in a funeral home [at the wake]." (R. 77.) Exemplary of the universal abhorrence for Morales were the e-mail messages sent to the newspaper's web board by newspaper readers: "I actually hope he gets off, and screws up again so he can get what he really and truly deserves, AN AUTOPSY!" "He is Puerto Rican TRASH." (R. 147-73.) Following the Springfield Union News article that Morales was allowed "up to $10,000 in public funds to hire experts," someone wrote to the web board: "$10,000 for defense fund for a two bit piece of garbage maggot with a

gold chain that will never change his ways." (R. 157.)

Worse, the press inaccurately portrayed Morales, casting him as remorseless and completely reprehensible. At a October 23, 2000 motion hearing there was "an explosive situation" in the courtroom, which was fully reported in the Springfield newspaper: with a packed courtroom, the victim's daughter "burst into tears" and said "that Morales had made kissing motions at her and her brother..." (R. 29; Tr. M. II/162.) The Court actually took testimony from observers in the courtroom to establish that the allegations were not substantiated.[1]

Finally, there was a sensationalist quality to many of the news stories. The Holyoke police department had hand-cuffed Morales with Officer DiNapoli's own hand-cuffs, and the media devoured such a melodramatic story.

Such relentless and pervasive publicity which painted the victim as the beloved and kind-hearted officer which he was[2] and

---

[1]

The judge stated for the record that as he walked by, he heard Mr. Morales saying to someone "Don't call me mother fucker," but the judge did not know to whom Morales was attributing such a statement. (Tr. M. II/ 165-66.) The judge further stated that he had not observed the District Attorney's allegations that Morales was staring at the family. (Tr. M. II/167.)

[2]

The prejudicial portrayal of Officer DiNapoli continued throughout the trial. The Court allowed admission by the Commonwealth of a photograph of DiNapoli in life, which photograph was irrelevant for any purpose and unfairly

22

Morales as a vile, despicable, and remorseless murder cannot
help but have subliminally filtered into the conscious and
unconscious attitudes of the jury pool of Hampden County. And,
where 100% of the seated panel had been exposed to the invidious
publicity, the seated jury panel was "utterly corrupted by press
coverage." Dobbert v. Florida, 432 U.S. 282, 303 (1977).

The entire jury pool was exposed to the pervasive
publicity. "It is ... the height of naivete to conclude that
jurors exposed to such pernicious influence could,
notwithstanding their good faith assertions to the contrary,
give [the Defendant] a fair and impartial trial free from such
pressures." United States v. Morales, 815 F.2d 725, 775 (1st
Cir. 1987), Torruella, J., dissenting. There were eighty-nine
total jurors in the two-day venire. Of the eighty-nine jurors,
only two had never heard of the facts of this case. And those
two were challenged by the Commonwealth. (Tr. I/259, 369.)
Therefore, 100% of the jury which sat on the case was exposed to
the prejudicial, inflammatory pre-trial publicity.

The jury voir dire was inadequate to determine partiality.
All but one question were leading questions, and very few jurors

---

prejudicial. (Tr. III/61.) And, the Commonwealth was allowed to
call as its first witness DiNapoli's fiancé, whose testimony,
defense counsel objected, was "intended solely for sympathy and
no other reason." (Tr. III/56.)

answered with any answer other than yes or no.  The use of
leading and conclusory questions in jury voir dire has been held
insufficient to probe and establish jury exposure to publicity.
*See* Coleman v. Kemp, 778 F.2d 1487, 1543 (11th Cir. 1985).
Jurors should have been asked open-ended questions which would
have prompted answers which indicated partiality.

   Studies have shown that jury voir dire is an  inadequate
device to rid the jury of bias because jurors are either silent
or they misrepresent their prejudices and preconceptions.   J.
Mariniello, The Death Penalty and Pre-trial Publicity: Are
Today's Attempts at Guaranteeing a Fair Trial Adequate?  8 Notre
Dame J.L. Ethics & Pub. Pol'y 371, 381 (1994), *citing* T.
Frederick, The Psychology of the American Jury 27 (1987).  Here,
the voir dire was ineffective in determining bias or partiality,
and the only effective means to ensure a fair trial would have
been a change of venue.

   At the end of the voir dire when defense counsel had almost
used all of his challenges, he stated for the record that he
"reluctantly" accepted juror 6-15 whose cousin was married to a
Holyoke police officer,  and, despite his "reservations," he
"reluctantly" accepted juror 1-7[3] "because she's a minority more

--------

[3]
   During voir dire, Juror 1-7 discussed at length the multiple
conversations she had had regarding the case, the fact that she

than anything else.  I have reservations about her." (Tr. I/321; II/82.)

And, on the second day of jury selection, defense counsel objected in general to the jury venire: "There is a complete lack of apparently minority individuals in the jury pool. Yesterday I think there might have been two or thee of the ninety-six that we brought in yesterday which is clearly not a comparative cross section of the Hampden County community.... There just simply are not any in the pool, and those that are in the pool that have been questioned have been excused." (Tr. II/5.)

It was manifestly unfair to have excluded from the jury every potential minority juror except the one accepted by the defense "reluctantly" and "with reservations." Morales was denied his Sixth Amendment right to be tried before a jury drawn from a fair and representative cross-section of the community and, as a Hispanic, his Fourteenth Amendment right to equal protection. However, had venue been changed, jury composition

---

had "a lot of lawyers" in her family, and the fact that she believed that the media "tells the public what they want us to know." (Tr. II/80.)  Juror 1-7 was seated as number 13 and was the juror who later ignored the Court's order not to form a conclusion, violated the order not to deliberate, mouthed answers to questions before a witness had time to answer, and generally distracted the other jurors by her inappropriate behavior. See infra.

would not have been a problem because there would not have been
so many jurors excused as partial.

Some courts have considered how many non-seated members of
the venire admitted to a disqualifying prejudice as an indicator
for determining whether community prejudice resulting from
publicity may have subconsciously infected the jurors who were
seated. *See* Murphy v. Florida, 421 U.S. 794, 803 (1975)
(holding that twenty-five per cent of venire partial not
suggestive of community so "poisoned against petitioner as to
impeach the indifference of jurors").

Studies have shown that even after omitting all of the
self-excusals, jurors who had been exposed to highly prejudicial
publicity were significantly more likely to convict (fifty-three
per cent guilty) than those not exposed (twenty-three per cent
guilty). N. Kerr, G. Kramer, J. Carroll, J. Alfini, On the
Effectiveness of Voir Dire in Criminal Cases with Prejudicial
Pretrial Publicity: An Empirical Study, 40 Am.U.L.Rev. 665, 669
(1991). The psychology of news readers after an event such as a
killing is such that they naturally, subconsciously seek a
resolution. An event which disturbs the social order such as a
crime will "breed instinctive hostility for the person who
committed such a disturbance, since the need for order demands
that the disturber be caught and punished and that society be

26

protected."  Goggin & Hanover, <u>Fair Trial v. Free Press: The
Psychological Effect of Pre-Trial Publicity on the Juror's
Ability to be Impartial</u>, 38 S.Cal.L.Rev. 672, 677 (1965).  In
its search for scapegoats, the public "tends to take a harsh,
retributive attitude toward criminal offenders or supposed
criminal offenders.  And newspapers tend to give the public what
it wants."  <u>Id</u>. at 677, n.29.  Those subliminal messages,
delivered by the news media, are impossible to eradicate in the
potential jury pool.  And where almost sixty per cent of the
venire were excused for causes which were consciously admitted
by them in voir dire, the other forty per cent had to have been
subconsciously affected by the pre-trial media circus and its
frenzy.

Change of venue is the preferred remedy where a community
has been saturated with publicity adverse to the defendant.
<u>Finnegan v. United States</u>, 203 F.2d 105, 110 (8th Cir.), <em>cert.
denied</em>, 346 U.S. 821, <em>reh. denied</em>, 346 U.S. 880 (1953).  Change
of venue is not only an efficient remedy in terms of judicial
resources, but is appropriate in a case such as this where the
enormous prejudice against the defendant is only local.  Change
of venue motions have been said to be "under-utilized" by trial
judges, yet studies have shown that their use will "lessen the
amount of prejudice [against a defendant because] occupants of a

county in which a crime was committed are more likely to be pro-
prosecution." J. Mariniello, The Death Penalty and Pre-trial
Publicity: Are Today's Attempts at Guaranteeing a Fair Trial
Adequate? 8 Notre Dame J.L. Ethics & Pub. Pol'y, 371, 377
(1994).

The "totality of the circumstances" - the extent of
publicity, the inflammatory nature of the publicity, the fact
that ninety-eight per cent of the venire were aware of the
events, and the fact that almost sixty per cent of the venire
were excused for partiality - were such that the defendant's
trial was not "fundamentally fair." Murphy v. Florida, 421 U.S.
794, 799 (1975). Even the Commonwealth realized that the
information  disseminated at the pre-trial hearing "would make
the issue of a motion for a change of venue a forgone
conclusion." (Tr. M. III/12, 15.) But by that time, all of the
Commonwealth's documents, including "a most extensive police
report for which [the Court could] find no justification for its
inclusion" had already been disseminated and had "been quoted if
not published in the newspaper and reported orally on the
television previously." (Tr. M. III/5.)

A change of venue is what Morales requested here,[4] and the

---

[4]

The Motion for Change of Venue was argued pre-trial (R. 37),
but the request was fervently repeated at the beginning of the