# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **EDDIE O. MORALES,** ) | |
| **Petitioner,** ) | |
| ) | **Civil Action No. 04-30191-MAP** |
| **v.** ) | |
| ) | |
| **LOIS RUSSO, Superintendent,** ) | |
| **Respondent.** ) | |

## RESPONDENT'S MEMORANDUM IN OPPOSITION
## TO PETITION FOR WRIT OF HABEAS CORPUS

The respondent, Lois Russo, hereby opposes the application of Eddie Morales,
("petitioner") for a writ of habeas corpus and urges this Court to dismiss his petition. As
grounds, the respondent states that contrary to the petitioner's arguments in his memorandum in
support of his petition, ("Pet. Mem."), the Supreme Judicial Court of Massachusetts ("SJC")
neither unreasonably determined the facts of the case, nor issued an opinion that was contrary to,
or an unreasonable application of, clearly established federal law as determined by the United
States Supreme Court. *See* 28 U.S.C. 2254(d)(1)-(2). Nor is the petitioner being held in
violation of the Constitution or laws or treaties of the United States. 28 U.S.C. § 2254(a).

### PRIOR PROCEEDINGS

The facts underlying the petitioner's conviction are set forth in the SJC's opinion in
*Commonwealth v. Morales*, 440 Mass. 536, 800 N.E.2d 683 (2003).[1]

John DiNapoli, the victim, was a twenty-three year veteran of the Holyoke police

---

[1] To the extent the petitioner believes the SJC unreasonably determined the facts of his
case, it is his burden to prove this by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).
Absent such a showing, this Court presumes that the facts found by the SJC are correct. *Id.* For
the convenience of the Court, the respondent will file transcripts of the trial separately.

2

force. On the morning of December 22, 1999, while driving in an unmarked
police cruiser, DiNapoli heard a radio dispatch reporting a fight at the corner of
Sargent and Walnut Streets. Unarmed and in plain clothes, he transmitted to the
dispatcher that he would "see what was going on." On arriving at the scene, he
saw the defendant, whose appearance matched the dispatcher's description of one
of the men involved in the altercation. As the defendant fled on foot, DiNapoli
gave chase in the cruiser. At some point, the defendant stopped running and
began firing a gun at the cruiser. DiNapoli put the cruiser in reverse and slowly
backed away, but the defendant pursued the vehicle and continued to fire.
DiNapoli had been shot five times and could not be resuscitated by paramedics
who were called to the scene. (There were ten bullet holes in DiNapoli's vehicle.)
The defendant fled, discarded his gun, and managed to make his way to Scranton,
Pennsylvania, where he was apprehended by local police on December 27, 1999,
and confessed to them that he had shot Officer DiNapoli. Massachusetts State
police traveled to Pennsylvania and the defendant also gave a statement to them.

*Morales*, 440 Mass. at 538, 800 N.E.2d at 687.

The Court also found the following facts with respect to the publicity that the case

attracted,[2] all of which the petitioner put before the trial court in support of his unsuccessful

motion for a change of venue:

The bulk of the publicity cited by the defendant to support his motion was printed
in the Springfield Union-News, a daily newspaper in Hampden County, which
reached approximately 136,000 readers. Starting the day after the shooting, the
Union-News published stories about DiNapoli, about the defendant's flight and
capture, and about public reaction to the shooting. On December 27, 1999, the
date of the defendant's arrest, one article reported that an attendee at DiNapoli's
wake said that "it was the first time they heard people shouting hooray in a funeral
home." Another story the same day reported that "[h]undreds of people" waited
outside in the cold to pay their respects to DiNapoli. Subsequent articles in
December, 1999, referred to the defendant's confession and prior criminal history.
In January, 2000, Union-News stories detailed the establishment of a memorial
fund in DiNapoli's honor and the expected passage of a Holyoke city council
ordinance which called for affixing "WWJDD" decals ("What would John
DiNapoli do") on all police cruisers. Follow-up stories about DiNapoli's family
and posthumous honors appeared in the Union-News at least until July, 2000, and
news about the defendant also received continuing coverage. The defendant

_____

[2] The respondent includes these factual findings because they bear directly on the
petitioner's claim at pages 15-30 of his memorandum of law.

3

> further cited over one dozen stories about DiNapoli's death in the Boston Globe
> and Boston Herald including a December 30, 1999, Herald report bearing the
> headline: "DA: Suspect knew DiNapoli was a cop."  In addition, the defendant
> point[ed] to media coverage in the Telegram & Gazaette (a newspaper in the
> adjacent county of Worcester with a circulation of 147,000), television reports
> (including a local broadcast of DiNapoli's funeral), and a "web board," on which
> readers posted comments such as "He is Puerto Rican Trash" and "I actually hope
> he gets off . . . so he can get what he really and truly deserves, AN AUTOPSY."

*Morales*, 440 Mass. at 539, 800 N.E.2d at 687.

The SJC also found that, "[a]s a result of this publicity, the vast majority of the venire was aware to some extent of the events surrounding DiNapoli's death.  Of the sixteen jurors eventually empanelled, all knew about his death and all but one explicitly stated that they had received at least some of their information from the extensive media coverage."  *Id.* at 540, 800 N.E.2d at 688.

Subsequently, a Hampden County grand jury indicted the petitioner for first-degree murder, *see* Mass. Gen. Laws. ch. 265, § 1, and a Hampden Superior Court jury convicted him as charged, on theories of deliberate premeditation and extreme atrocity or cruelty, on March 16, 2001 (McDonald, J., presiding).  *See* [Supplemental Answer "S.A." 1, 6].  That same day, the trial judge (McDonald, J.) sentenced the petitioner to the statutorily-mandated term of life imprisonment without the possibility of parole.  *See* [S.A. 6]; Mass. Gen. Laws ch. 265, § 2.

All Massachusetts first-degree murder convictions are reviewed directly by the Supreme Judicial Court.  Mass. Gen. Laws ch. 278, § 33E.  That court reviewed, and ultimately affirmed, the petitioner's convictions on December 11, 2003.  *See Commonwealth v. Morales*, 440 Mass. 536, 800 N.E.2d 683 (2003).

4

## DISCUSSION[3]

The petitioner asks this Court to grant him relief, in the form of a writ of habeas corpus, from his first-degree murder conviction. Under the Antiterrorism and Effective Death Penalty Act ("AEDPA"), "a federal court is precluded from granting habeas corpus relief unless the state court adjudication 'resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States,' or was based on 'an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.'" *Paulding v. Allen*, 393 F.3d 280, 283 (1st Cir. 2005) (quoting 28 U.S.C. § 2254(d)(1)-(2)); *Brown v. Payton*, 544 U.S. ___, No. 03-1039, (March 30, 2005).

"Under the 'contrary to' prong of 28 U.S.C. § 2254(d)(1), the petition may be granted if the state court 'arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts.'" *Horton v. Allen*, 370 F.3d 75, 80 (1st Cir. 2004), *cert. denied*, 125 S. Ct. 971 (2005) (quoting *Williams v. Taylor*, 529 U.S. 362, 413-413 (2000)) (alterations in original). "The word 'contrary' is commonly understood to mean 'diametrically different,' 'opposite in character or nature,' or 'mutually opposed.'" *Williams v. Taylor*, 529 U.S. 362, 404-405 (2000). "A state court decision contravenes the 'unreasonable application' criterion when, though it correctly identifies the pertinent United States Supreme Court rule, its application to the particular facts of the case at bar is objectively unreasonable." *Correia v. Hall*,

---

[3] The petitioner presents his claims in his memorandum in a different order from the petition itself. The respondent addresses the claims in the order they appear in the petitioner's memorandum.

5

364 F.3d 385, 388 (1st Cir. 2004) (citing *Williams*, 529 U.S. at 409-410).  Thus, "[a] state court

decision may be 'unreasonable if it is devoid of record support for its conclusions or is

arbitrary.'"  *Ellsworth v. Warden*, 333 F.3d 1, 8 (1st Cir. 2003) (quoting *McCambridge v. Hall*,

303 F.3d 24, 37 (1st Cir. 2002)).  In addition, to satisfy the "unreasonable" requirement, the

decision must contain "'some increment of incorrectness beyond error.'"  *Ellsworth*, 333 F.3d at

8 (quoting *McCambridge*, 303 F.3d at 36).  This deferential analysis accords with Congress's

intent for "federal judges to attend with the utmost care to state-court decisions, including all of

the reasons supporting their decisions, before concluding that those proceedings were infected by

Constitutional error sufficiently serious to warrant the issuance of the writ."  *Williams*, 529 U.S.

at 386.

     To support his request for habeas corpus relief, the petitioner raises nine claims.  This

Court should deny relief because none of his claims is contrary to, or involves an unreasonable

application of federal law, and to the extent he challenges the facts as determined by the Supreme

Judicial Court, he fails to satisfy his burden of providing clear and convincing evidence that they

were erroneous.  *See* 28 U.S.C. § 2254(e)(1).

I.     **THE SUPREME JUDICIAL COURT CORRECTLY DETERMINED THAT THE
     PRE-TRIAL PUBLICITY DID NOT INTERFERE WITH THE PETITIONER'S
     RIGHT TO A FAIR TRIAL.[4]**

     "[T]he right to jury trial guarantees to the criminally accused a fair trial by a panel of

impartial, 'indifferent' jurors."  *Irvin v. Dowd*, 366 U.S. 717, 722 (1961); *United States v.*

*Angiulo*, 897 F.2d 1169, 1181 (1st Cir.) *cert denied sub nom. Granito v. United States*, 498 U.S.

845 (1990).  "It is not required, however, that the jurors be totally ignorant of the facts and issues

---

[4] Responding to petitioner's argument "I," at pages 15-30 of his memorandum.

6

involved." *Irvin*, 366 U.S. at 722; *Murphy v. Florida*, 421 U.S. 794, 795 (1975).  Indeed, "[t]o

hold that the mere existence of any preconceived notion as to guilt or innocence of an accused,

without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be

to establish an impossible standard."  *Irvin*, 366 U.S. at 723.  "It is sufficient if the juror can lay

aside his impression or opinion and render a verdict based on the evidence presented in court."

*Id.* (citations omitted).

        A court may nevertheless presume prejudice "in a case where the general atmosphere in

the community or courtroom is sufficiently inflammatory."  *Murphy*, 421 U.S. at 802; *Rideau v.*

*Louisiana*, 373 U.S. 723, 726 (1963).  "There are two factors that could call for a presumption of

prejudice.  First, prejudice may properly be presumed where prejudicial, inflammatory publicity

about a case so saturated the community from which the defendant's jury was drawn as to render

it virtually impossible to obtain an impartial jury."  *Angiulo*, 897 F.2d at 1181 (internal

quotations omitted).  "To justify a presumption of prejudice under this standard, the publicity

must be both extensive *and* sensational in nature.  If the media coverage is factual as opposed to

inflammatory or sensational, this undermines a claim for a presumption of prejudice."  *Id.* (citing

*Murphy*, 421 U.S. at 802) (emphasis in original).

        "A second factor that could support a presumption of prejudice is a more indirect measure

that looks at the 'length to which the trial court must go in order to select jurors who appear to be

impartial.'"  *Id.* (quoting *Murphy*, 421 U.S. at 802).  "Where a high percentage of the venire

admits to a disqualifying prejudice, a court may properly question the remaining jurors' avowals

of impartiality and choose to presume prejudice."  *Id.* at 1181-1182.  In the petitioner's case, the

Supreme Judicial Court correctly applied these standards when concluding that "the defendant's

7

right to a fair trial was not compromised." *Morales*, 440 Mass. at 593, 800 N.E.2d at 690-691.

     A.     <u>The Publicity Surrounding the Murder Was Neither Inflammatory Nor Sensational</u>

     The petitioner's contention that "the pre-trial publicity was pervasive and relentless" and that "it was highly inflammatory" is belied by the record. Pet. Mem. at 15. In support of his motion for a change of venue in the trial court, and again in the SJC, the petitioner introduced thirty-eight newspaper articles[5] and twenty-one comments posted on an internet chat-room titled "Holyoke Forum." *See* www.masslive.com/forums/holyoke (accessed March 25, 2005). [S.A. 228-252]. Of the thirty-eight newspaper articles, sixteen of them appeared in either the Boston Globe or Boston Herald, neither of which can be characterized as a newspaper of general circulation in Hampden County. [S.A. 144-156, 162-164, 171, 175-182, 187-188]. *See* http://bostonglobe.com/advertiser/mrktdata/bostonglobemrkt/circulation/circbk.pdf (describing geographic circulation of Boston Globe and Boston Sunday Globe which does not include Hampden County); www.heraldmedia.com/images/hm_online_media_kit.pdf (describing geographic circulation of Boston Herald which does not include Hampden County). Most of the remaining articles were "printed in the Springfield Union News, a daily newspaper in Hampden County, which reached approximately 136,000 readers." *Morales*, 440 Mass. at 539, 800 N.E.2d at 687. The petitioner also introduced two articles, both dated December 30, 1999, from the Worcester Telegram & Gazette, "a newspaper in the adjacent county of Worcester with a circulation of 147,000." *Id.*, 800 N.E.2d at 688. [S.A. 186, 191].[6]

---

     [5] While it appears that the petitioner introduced forty-two newspaper articles, in fact, four of them were introduced twice. [S.A. 182, 188; 210, 211; 217, 219; 203, 225].

     [6] The SJC also noted that the petitioner argued that there was local television coverage of the murder as well. *See Commonwealth v. Morales*, 440 Mass. 536, 539, 800 N.E.2d 683, 688

8

As the SJC concluded, the media coverage "was primarily factual, summarizing the incident, the charges against the defendant, and his arrest in Pennsylvania. The coverage did mention the defendant's confession, his criminal record, and the fact of the victim's twenty-one year service as a police officer, his popularity in the community, and the memorials in his honor." *Morales*, 440 Mass. at 540, 800 N.E.2d at 688. Standard coverage of a criminal case such as this is neither inflammatory nor sensational. *United States v. Brandon*, 17 F.3d 409, 441 (1st Cir.), *cert. denied sub nom. Granoff v. United States*, 513 U.S. 820 (1994); *Angiulo*, 897 F.2d at 1181 (references to defendant as "reputed crime figure," "mafia boss" or "reputed leader of Boston underworld," while "not phrased in the most genteel or flattering manner, fall significantly short of the type of emotionally charged, inflammatory, sensationalistic coverage needed to support a presumption of prejudice."); *Murphy*, 421 U.S. at 795 (media references to defendant as "Murph the Surf" and notoriety for his part in 1964 theft of Star of India Sapphire insufficient to warrant reversal).

Moreover, the bulk of the news articles and web-postings the petitioner cited appeared in late-December, 1999 and into the first quarter of 2000. [S.A. 107-110, 146-206, 239-252]. Most of the remaining reporting took place in the Spring and Summer of 2000, and in fact, the most recent article the petitioner cited appeared on October 24, 2000. [S.A. 111, 210-225, 232-238]. The petitioner was not tried, however, until March, 2001. [S.A. 5]. Thus, interest in the case, and passions as well, had likely abated. *See Murphy*, 421 U.S. at 802; *Mayloa v. Alabama*, 623

---

(2003). In his memorandum to this Court, the petitioner maintains that "all of the local television stations carried repeated coverage of the shooting, the massive manhunt, and the arrest, with pictures of the numerous bullet holes in the windshield." Pet. Mem. at 17. He does not allege when these broadcasts aired, and there does not appear anything in the record below to further explain this.

9

F.2d 992, 995-997 (5th Cir. 1980), *cert. denied*, 451 U.S. 913 (1981) (news article day before

impanelment regarding defendant's statement that he would "deserve anything he got" not

grounds for reversal).  Finally, the amount of coverage here, fewer than forty articles and twenty-

three web-postings, is significantly less than the amount required for the jurors to have been

presumed prejudiced.  *See Brandon*, 17 F.3d at 441-442 (44 newspaper articles insufficient to

presume prejudice); *United States v. Orlando-Figueroa*, 229 F.3d 33, 42 (1st Cir. 2000) (153

articles in seven newspapers insufficient); *United States v. Medina*, 761 F.2d 12, 18 (1st Cir.

1985) (212 articles, 153 of which mentioned defendant by name insufficient).[7]

B.    There Was No Basis for the State Court to Presume Prejudice By The Venire

"Where a high percentage of the venire admits to a disqualifying prejudice, a court may

properly question the remaining jurors' avowals of impartiality, and choose to presume

prejudice."  *Angiulo*, 897 F.3d at 1181-1182.  In this case, the petitioner notes that there were

eighty-nine jurors, and all but two had never heard of this case.  *See* Pet. Mem. at 23.  He then

notes that the Commonwealth successfully challenged the two jurors who had not heard of the

case, leaving "100% of the jury which sat on the case" exposed to the publicity.  Pet. Mem. at 23.

---

[7] The petitioner relies heavily on an Eleventh Circuit opinion in which the Court did
reverse for prejudicial media coverage.  *See Coleman v. Kemp*, 778 F.2d 1487 (11th Cir.), *cert.
denied*, 476 U.S. 1164 (1986).  *Coleman* is distinguishable from this case for several reasons.
First, the Eleventh Circuit found it significant that, unlike here, the trial judge did not conduct an
individual voir dire.  *Id.* at 1541-1542.  Second, there was evidence that the community in which
Coleman was tried almost uniformly believed that he, an out-of-state stranger, was guilty.  *Id.* at
1539.  Third, nearly one-half of the venire from which the jury was drawn testified to fixed
opinions as to his guilt.  *Id.* at 1543.  Here, only twenty-five percent of the venire in this case
testified that they were prejudiced against the petitioner.  *Morales*, 440 Mass. at 541, 800 N.E.2d
at 689.  Finally, the county in which Coleman was tried had a population of 7,000.  *Coleman*, 778
F.2d at 1540.  In contrast, according to the 1990 census, Hampden County had a population of
456,310.  [S.A. 258].

10

The petitioner's analysis misses the mark by a wide margin.

To begin with, and as the Supreme Court has noted, "an important case can be expected to arouse the interest of the public in the vicinity, and scarcely any of those best qualified to serve as jurors will not have formed some impression or opinion as to the merits of the case." *Irvin*, 366 U.S. at 722. Thus, "[q]ualified jurors need not . . . be totally ignorant of the facts and issues involved," because familiarity is very different from actual predisposition. *Murphy*, 421 U.S. at 799-800 and n.4. Here, as the SJC correctly noted, the relevant inquiry "is the percentage of the venire disqualified for cause due to prejudice from pretrial publicity." *Morales*, 440 Mass. at 541, 800 N.E.2d at 689 (citations omitted); *see United States v. Moreno Morales*, 815 F.2d at 725, 733-734 (1st Cir.), *cert. denied*, 484 U.S. 966 (1987) (twenty-five percent of venire admitting to predisposition of defendant's guilt insufficient to presume prejudice of entire panel). The SJC's review of the record revealed that "only fourteen jurors, or approximately twenty-five per cent of the venire, were disqualified for exposure to media coverage." *Morales*, 440 Mass. at 541, 800 N.E.2d at 689.[8]  As in *Moreno Morales*, this number is insufficient to warrant the assumption that the jury pool was inherently tainted against the defendant.  815 F.2d at 733-734.

---

[8] In his memorandum, the petitioner complains that the judge's questions of the jurors were "inadequate to determine partiality."  Pet. Mem. at 23-24.  This claim is belied by the findings of the Supreme Judicial Court, which concluded, "[t]he judge was well aware of the potential for prejudice in the minds of the jurors and proceeded with extreme caution to assure that the jurors selected were unswayed by any media publicity and were impartial. . . . He extensively probed the jurors to discern their exposure to the pretrial publicity, their knowledge of the murder and the defendant's arrest, whether they were emotionally effected by the crime, whether they had discussed the case or formed opinions, and whether they would be uncomfortable if the defendant were acquitted or affected if he did not testify or present evidence." *Morales*, 440 Mass. at 542-543, 800 N.E.2d at 690.  To the extent the petitioner disagrees with these findings, it is his burden to rebut them, by clear and convincing evidence.  28 U.S.C. § 2254(e)(1).  He has failed to do so.  Thus, this Court presumes that they are correct. *Id.*

11

## II.   THE PROSECUTOR DID NOT COMMENT ON THE PETITIONER'S FAILURE TO TESTIFY.[9]

The petitioner's second claim for relief is that the Supreme Judicial Court unreasonably applied clearly established federal law in determining that the trial prosecutor did not comment on his failure to testify at trial. *See* Pet. Mem. at 30-32. "It is well-established that 'the Fifth Amendment . . . forbids either comment by the prosecution on the accused's silence or instructions by the court that such silence is evidence of guilt.'" *United States v. Newton*, 327 F.3d 17, 27 (1st Cir.), *cert. denied*, 540 U.S. 928 (2003) (quoting *Griffin v. California*, 380 U.S. 609, 615 (1965)) (alteration in original).  A reviewing court "looks at whether the prosecutor's language shows a manifest intention to comment on the defendant's failure to testify and whether the jury would naturally and necessarily understand it to be a comment on the defendant's failure to testify." *United States v. Barbour*, 393 F.3d 82, 90 (1st Cir. 2004) (citing *United States v. Wihbey*, 75 F.3d 761, 769 (1st Cir. 1996)).  The court will review the prosecutor's argument in context, not in isolation, to determine whether it comports with the petitioner's Fifth Amendment rights. *United States v. Bey*, 188 F.3d 1, 9 (1st Cir. 1999) (citing *United States v. Lilly*, 983 F.2d 300, 307 (1st Cir. 1992)).

In pressing his claim that the prosecutor violated his Fifth Amendment right, the petitioner seizes upon the following excerpt from the prosecutor's closing argument: "[I]f it was self-defense, you would think he would want to tell the truth about how the shooting actually happened.  If he's acting in self-defense, then isn't he . . . going to want to say the truth about what happened?"  Pet. Mem. at 30 (quoting [Tr. VIII: 66] (March 16, 2001)).  As the SJC noted,

---

[9] Responding to petitioner's argument "C," at pages 30-32 of his memorandum.

12

"[s]tanding alone, this statement might well be considered comment on the [petitioner's] failure to testify. But the [petitioner] has removed this statement from its context." *Morales*, 440 Mass. at 551, 800 N.E.2d at 695. When placed in its proper context, "the prosecutor's reference is not to the [petitioner's] failure to testify at trial, but to the fact that when the [petitioner] gave a statement to the police in Scranton, Pennsylvania, he never mentioned anything related to self-defense." *Id.*, 800 N.E.2d at 696; *see Bey*, 188 F.3d at 9. "In this way, the prosecutor permissibly suggested that the defendant's self-defense theory was a later contrivance." *Morales*, 440 Mass. at 551, 800 N.E.2d at 696. Ultimately, the SJC ruled, "[t]he prosecutor is entitled to comment on the defendant's statement [to the police] and to compare it to the evidence in the case." *Id.*, 800 N.E.2d at 696. Because this is a correct statement of federal law as well, *see Kibbe v. Dubois*, 269 F.3d 26, 38-39 (1st Cir. 2001), *cert. denied*, 535 U.S. 960 (2002), there was neither a ruling that is contrary to, nor an unreasonable application of, clearly established federal law. *See* 28 U.S.C. § 2254(d)(1). Under these circumstances, the petitioner's application for habeas relief on this ground must be denied.

## III.    THE PETITIONER'S TRIAL WAS FAIR IN EVERY RESPECT.[10]

The petitioner next claims that he was denied his constitutional right to a fair trial because: 1) the police allegedly intimidated a witness; 2) the media published a photograph of the jury; 3) a juror allegedly formed a conclusion as to his guilt prior to the close of the evidence, and distracted the other jurors; and 4) the court admitted evidence of the petitioner's threat to kill another person. *See* Pet. Mem. at 32-41. In ruling on these claims, the Supreme Judicial Court did not unreasonably apply clearly established federal law. In fact, the petitioner's rights were

---

[10] Responding to petitioner's argument "D," at pages 32-38 of his memorandum.

13

scrupulously honored throughout the trial and the SJC's rulings comport with Federal

Constitutional principles in every respect.

A.    The Police Did Not Intimidate Witness Hector Cabrera

In his memorandum, the petitioner maintains that the police intimidated several defense

witnesses.  *See* Pet. Mem. at 32-34.  His principal claim is that "[t]he state police actually

stopped a defense investigation by taking a witness out of his house *in the middle of questioning*,

after which the witness refused to answer defense questions, refused to talk to the defense

investigator, and refused to answer telephone calls or the door."  Pet. Mem. at 33 (emphasis in

original).  This claim is belied by the SJC:

> During trial preparation, one witness, Jose Hernandez, overslept and missed an
> appointment for an interview at the district attorney's office.  Police officers went
> to his home where coincidentally he was being interviewed by defense
> investigators.  After reminding him of his missed appointment and of the fact that
> he could speak to the defense investigators or not, as he wished, the police left his
> home.  Hernandez then stopped speaking with the defense investigators, made a
> subsequent appointment with them, and, forty-five minutes later, left for the
> district attorney's office.  A 'couple of days' later, the defense investigators
> returned to Hernandez's apartment and completed their questioning of him.

*Morales*, 440 Mass. at 544, 800 N.E.2d at 691.[11]  Under these facts, there was no intimidation of

this witness.

The petitioner further claims that "[o]ne of the witnesses received death threats."  Pet.

Mem. at 33.  Although the SJC did not address this claim, which amounted to one sentence of the

---

[11] The petitioner's reliance on representations from counsel at a non-evidentiary, pre-trial
motion hearing can hardly be considered adequate to sustain his burden of demonstrating by clear
and convincing evidence that the Supreme Judicial Court made "an unreasonable determination
of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(2), (e)(1).  In fact,
at trial, the witness testified entirely consistently with the facts as the SJC determined them to be.
[Tr 7: 103-118] (March 15, 2001).  Thus, the SJC's findings are fully supported by the record.

14

petitioner's sixty-page brief to that court,[12] [S.A. 57, 76], the petitioner himself, when addressing

this point to the trial court, acknowledged, "[t]here is great fear against both the defense and the

prosecution." [M. Tr. 86] (March 1, 2001).  And more to the point, the petitioner never

suggested, until he was before the SJC, that the death threats came from the police, as opposed to

the petitioner himself.  *Id.*  Thus, his claim that the police issued the death threats is baseless

speculation lacking any evidentiary support whatsoever.

Finally, the record is clear that the police did not, as the petitioner suggests, advise

defense witnesses to ignore subpoenas.  *See* Pet. Mem. at 33.  Rather, they merely advised those

witnesses that their attendance was not required during jury impanelment.  [M. Tr. 90] (March 1,

2001).  There was no witness intimidation whatsoever.  The petitioner's argument to the contrary

is inaccurate and does not provide a basis upon which to award habeas corpus relief.

B.    Publication of a Photograph of The Jury Did Not Violate The Petitioner's Right
      To A Fair Trial

The petitioner also claims that he was denied his right to a fair trial due to a newspaper

photograph of the jury.  *See* Pet. Mem. at 34-35.[13]  He theorizes that "[p]ublication of

photographs of the jurors during trial in such an emotionally fraught trial had to have had the

effect of compelling conviction."  Pet. Mem. at 35.

Here, as the SJC noted, and as the record bears out, "there is no indication in the record

that any juror other than juror no. 8 was aware of the photograph."  *Morales*, 440 Mass. at 545,

---

[12] This would not constitute proper appellate argument.  *See* Mass. R. App. P. 16(a)(4).
Consequently, this Court should consider the claim unexhausted, and decline to entertain it.  *See
Rhines v. Weber*, 544 U.S. ___, No. 03-9046 (March 30, 2005).

[13] This photograph was published despite the trial judge's order to prohibiting the media
from photographing the jurors' faces.  *See Morales*, 440 Mass. at 544, 800 N.E.2d at 691.

15

800 N.E.2d at 692 (Tr. 4: 23-27). Further, juror no. 8 "was questioned by the judge and reported

no embarrassment or discomfort from the fact that people were now aware that he was serving on

this jury. He stated that the publication of the picture would not affect his impartiality. All

parties indicated they were satisfied with the juror's remaining on the panel; he was retained and

instructed not to discuss the matter with the other jurors." *Id.* at 544, 800 N.E.2d at 691 [Tr. 4:

23-27] (March 12, 2001). Under these circumstances, there is no fair comparison to *Maxwell v.*

*Sheppard*, 384 U.S. 333 (1966), upon which the petitioner relies. *See* Pet. Mem. at 35. In

*Sheppard*, "the jurors were thrust into the role of celebrities" and "numerous pictures of the

jurors, with their addresses . . . appeared in the newspapers before and during the trial itself." *Id.*

at 353. Here, there is no basis to conclude that the defendant was denied his right to a fair trial.

C.    Juror No. 13's Behavior Did Not Result In The Deprivation of The Petitioner's
      Right To A Fair Trial

The petitioner next claims that one of the jurors distracted the other jurors by behaving

demonstratively. *See* Pet. Mem. at 35-37. As the petitioner notes, three jurors did complain

about the behavior on the seventh day of trial. *See* Pet, Mem. at 35-36; *Morales*, 440 Mass. at

545, 800 N.E.2d at 692. This behavior, the petitioner argues, is "indicative of a juror who has a

preconceived idea about [the] case and about the guilt of the accused." Pet. Mem. at 37. The

petitioner offers no support for this supposition, or for his underlying theory that the juror's

behavior deprived him of his right to a fair trial. *See* Pet. Mem. at 35-37.

Moreover, as the SJC correctly noted:

There is no reason to believe that juror no. 13's outward reactions to testimony
indicated that she was ignoring the judge's instructions, or was not listening to all
the testimony and according it appropriate weight. Our requirement that jurors
have an open mind and not decide the case until all the evidence is complete does

16

> not impose on jurors the necessity to avoid all reaction to testimony.  Such a
> requirement would be humanly impossible, and such reactions do not evidence
> bias or inattention on the part of the juror.

*Morales*, 440 Mass. at 546, 800 N.E.2d at 692.  This ruling, far from being contrary to clearly

established federal law, is entirely consistent with it.  *See United States v. Lemmerer*, 277 F.3d

579, 591-592 (1st Cir.), *cert. denied*, 537 U.S. 901 (2002) ("Trial judges enjoy broad discretion

in determining how best to respond to problems of jury management, and normally [the court]

will not reverse unless the judge's choice among the various avenues available was patently

unreasonable") (citing *United States v. Balsam*, 203 F.3d 72, 86 (1st Cir.), *cert. denied sub nom.,*

*Zackular v. United States*, 530 U.S. 1250 (2000)).  Consequently, habeas corpus relief is

inappropriate here as well.  *See* 28 U.S.C. § 2254(d)(1).

    D.    <ins>Evidence Of The Petitioner's Threat To Kill A Potential Witness Was Properly</ins>
             <ins>Admitted As Evidence Of His Consciousness of Guilt</ins>

At the petitioner's trial, "[e]vidence was admitted that after his arrest, in a recorded

telephone call made from the jail to his girl friend, the [petitioner] stated that Hector Cabrera had

given him the firearm 'when [the petitioner] was running the corner.'  The [petitioner] further

stated that if Cabrera 'hadn't talked, no one would have known.  They wouldn't have been able

to find me right away.'  He also said, 'It's better if I wait until he ends up around here and I will

kill him.'"  *Morales*, 440 Mass. at 546-547, 800 N.E.2d at 692-693.[14]  The petitioner objected to

this statement at trial, raised the issue on direct appeal to the SJC, and continues his argument

here - albeit without citation to authority, that it was unfairly prejudicial.  *See* Pet. Mem. at 37-

---

[14] The petitioner does not dispute the SJC's finding that "[t]he transcript of this telephone conversation was admitted as a stipulation.  The judge did not permit the transcript to be read to the jury during presentation of the evidence, but allowed the prosecutor to quote from it in his closing argument."  *Morales*, 440 Mass. at 546-547 n.6, 800 N.E.2d at 692-693.

17

38.

    In essence, the petitioner's claim is that his constitutional rights were violated by the

admission of his threat to kill a witness.  The fundamental, and fatal, flaw in his argument is that

the introduction of this evidence did not result in a decision that was contrary to, or an

unreasonable application of clearly established Federal law as determined by the Supreme Court.

28 U.S.C. § 2254(d)(1).  Consequently, there is no basis upon which to grant the petitioner

habeas corpus relief.  *Id.*  In any event, as the SJC found, the petitioner's statement that "no one

would have known" is evidence of his consciousness of guilt.  *Morales*, 440 Mass. at 547, 800

N.E.2d at 693.  It is well-established in this circuit, and other federal circuits, that admission of a

threat to kill a potential witness may be properly admitted as evidence of a defendant's

consciousness of guilt.  *United States v. Pina*, 844 F.2d 1, 9 (1st Cir. 1988) (citation omitted);

*see, e.g., United States v. Copeland*, 321 F.3d 582, 597 (6th Cir. 2003); *United States v. Young*,

248 F.3d 260, 272 (4th Cir.), *cert. denied*, 533 U.S. 961 (2001).  Thus, even if this case were on

direct appeal of a federal criminal conviction, there would be no error.[15]  Under these

circumstances, the SJC's ruling cannot be said to have been an unreasonable application of

federal law.

---

[15] It bears noting that the limited use of this evidence, in conjunction with the judge's
limiting instructions, ensured that the "disclosure of the [petitioner's] threat did not outweigh its
probative value."  *Morales*, 440 Mass. at 547, 800 N.E.2d at 693.

18

## IV.    THE PETITIONER'S RIGHT TO PRESENT A DEFENSE WAS SCRUPULOUSLY HONORED.

A.    <u>Federal Habeas Corpus Relief Does Not Lie Where, During Impanelment, The Judge Declined To Ask The Jurors Whether They Ever Found It Necessary To Defend Themselves From Physical Harm Or What They Had Been Taught About Self-Defense As Children</u>

The petitioner next claims that he was denied his Fifth Amendment right to present a defense; *i.e.*, self-defense. *See* Pet. Mem. at 38-40.  The crux of his claim is that, during juror voir dire, the judge declined to ask two questions the petitioner requested: "Have any of you ever found it necessary to defend yourself from physical harm?  What have you been taught while growing up about self-defense?"  Pet. Mem. at 39.

The petitioner's lack of citation to any federal authority to support his claim demonstrates that it lacks merit, particularly in the habeas context.  Under these circumstances, the petitioner cannot satisfy his burden of demonstrating that the judge's decision not to ask these two questions resulted in a decision that was contrary to or an unreasonable application of clearly established federal law as determined by the Supreme Court.  *See* 28 U.S.C. § 2254(d)(1).  This is all the more apparent where even the petitioner acknowledges that he did in fact assert a claim of self-defense.  *See* Pet. Mem. at 38 ("Morales's entire case was based on self-defense.").

B.    <u>The Prosecutor Did Not Vouch For The Credibility Of Any Witness When He Read A Portion Of The Petitioner's Statement To The Police Into Evidence</u>

The petitioner next claims that the prosecutor vouched for the credibility of a government witness.  Pet. Mem. at 40-41.  He theorizes that the vouching occurred when, after a trooper lost his composure while reading the petitioner's statement, the prosecutor, with the judge's permission, read portions of the statement into evidence "so that the jury could understand

19

further questions the prosecutor needed to ask about the circumstances of the questioning."

*Morales*, 440 Mass. at 549, 800 N.E.2d at 694; Pet. Mem. at 40.  Once again, the petitioner has

failed to cite any authority to support his claim; however, the Supreme Court, and the First

Circuit have each held that a prosecutor may not vouch for the credibility of a government

witness.  *United States v. Young*, 470 U.S. 1, 18-19 (1985); *see, e.g., United States v. Lopez*, 380

F.3d 538, 547 (1st Cir. 2004), *cert. denied*, 125 S. Ct. 924 (2005).  Here, there was no vouching.

A "prosecutor's vouching for the credibility of witnesses and expressing his personal

opinion concerning the guilt of the accused pose two dangers: such comments can convey the

impression that evidence not presented to the jury, but known to the prosecutor, supports the

charges against the defendant and can thus jeopardize the defendant's right to be tried solely on

the basis of the evidence presented to the jury; and the prosecutor's opinion carries with it the

imprimatur of the Government and may induce the jury to trust the Government's judgment

rather than its own view of the evidence." *Young*, 470 U.S. at 18-19 (citing *Berger v. United*

*States*, 295 U.S. 78, 88-89 (1935)).  As the SJC correctly concluded, the prosecutor did not vouch

for the credibility of his witness.  Rather, "[t]he prosecutor simply read a portion of a statement.

He did not express any belief in the credibility of the trooper or of the defendant and he did not

indicate any knowledge apart from the evidence." *Morales*, 440 Mass. at 549, 800 N.E.2d at

694.  As a result, the prosecutor's actions, far from being a ground upon which to grant habeas

relief, were entirely appropriate.  *Compare United States v. Josleyn*, 99 F.3d 1182, 1196-1197

(1st Cir. 1996), *cert. denied sub nom. Billmyer v. United States*, 519 U.S. 1116 (1997)

("Interjecting the prosecutor's personal life and individual efforts into the decisional mix not only

invited the jury to consider irrelevant matters beyond the record, but unfairly evoked jury

20

sympathy and diverted attention from the relevant evidence").   This Court must therefore deny

the petitioner habeas corpus relief on this ground as well.

      C.     <u>The Petitioner's Trial Counsel Was Not Ineffective For Failing To Move For A</u>
<u>Mistrial Where Such A Motion Would Have Been Futile</u>

In response to the question, "What was [Office DiNapoli] doing [when the defendant was

shooting at him]"?, a witness for the Commonwealth answered: "[H]onestly, the police officer

have no chance to react." *Morales*, 440 Mass. at 550, 800 N.E.2d at 695.   "Defense counsel

objected, the trial judge sustained the objection, directed the jury to disregard the answer and

reminded them that 'the answer is not evidence for your consideration.'" *Morales*, 440 Mass. at

550, 800 N.E.2d at 695.[16]  Here, the petitioner claims that trial counsel rendered ineffective

assistance because he did not move for a mistrial after a witness's answer to a question. *See* Pet.

Mem. at 41.  This claim is unavailing.

As the SJC noted, "[h]ere, the witness's answer was brief and was immediately struck by

the judge." *Morales*, 440 Mass. at 550, 800 N.E.2d at 695.  "[I]t is routinely presumed that jurors

will follow curative instructions and put aside matters that the trial court determines have been

improperly admitted." *United States v. Bradshaw*, 281 F.3d 278, 285 (1st Cir.), *cert. denied*, 537

U.S. 1049 (2002) (citing *United States v. Olano*, 507 U.S. 725, 740 (1993)); *S.E.C. v. Happ*, 392

F.3d 12, 27 (1st Cir. 2004) (citation omitted).[17]  Moreover, "[a] mistrial is declared in a criminal

---

[16] The petitioner does not dispute the SJC's recitation of the trial proceedings.

[17] It is true that this presumption may be overcome upon a showing "that it is probable
that: (1) responsible jurors will be unable to disregard the testimony; and (2) the testimony likely
will have a seriously prejudicial effect on the aggrieved party." *Bradshaw*, 281 F.3d at 285.
Here, the petitioner does not attempt to make such a showing, nor could any such attempt be
successful.

21

case only when manifest necessity requires it." *United States v. Theodore*, 354 F.3d 1, 6 (1st Cir.

2002) (citing *Illinois v. Somerville*, 410 U.S. 458, 462 (1973)).  Because the jurors are presumed

to have followed the judge's forceful limiting instruction, and because a mistrial is declared only

as a last resort, there was no basis for the trial judge to have entered a mistrial here.

Consequently, the petitioner's trial counsel did not render ineffective assistance by failing to file

a futile motion.  *Vieux v. Pepe*, 184 F.3d 59, 64 (1st Cir. 1999), *cert. denied*, 528 U.S. 1163

(2000) ("Obviously, counsel's performance was not deficient if he declined to pursue a futile

tactic") (citation omitted).  The SJC's ruling comported with federal law and provides no basis

for habeas corpus relief.

### CONCLUSION

For the foregoing reasons, this Court should dismiss the petition for writ of habeas corpus

with prejudice.

Respectfully submitted,

THOMAS F. REILLY
ATTORNEY GENERAL


/s/ Daniel I. Smulow
Daniel I. Smulow, BBO # 641668
Assistant Attorney General
Criminal Bureau
One Ashburton Place
Boston, MA 02108
(617) 727-2200, ext. 2949

Dated: March 31, 2005

22

## **Certificate of Compliance with Local Rule 7.1(A)(2)**

     I, Daniel I. Smulow, hereby certify that I conferred with Attorney Janet Pumphrey, counsel for the petitioner, on March 31, 2005, that she does not assent to this motion, and that we were unable to resolve or narrow the issues.

/s/ Daniel I. Smulow