UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| EDDIE O. MORALES, | ) | |
| Petitioner, | ) | |
| | ) | |
| | ) | |
| v. | ) | Civil Action No.  04-30191-MAP |
| | ) | |
| | ) | |
| LOIS RUSSO, Superintendent, | ) | |
| Respondent | ) | |

REPORT AND RECOMMENDATION WITH REGARD TO
PETITION FOR WRIT OF HABEAS CORPUS (Document No. 1)
October 11, 2005

NEIMAN, U.S.M.J.

        In this action, Eddie O. Morales ("Petitioner"), a state inmate serving a life

sentence for the 1999 murder of Holyoke Police Officer John DiNapoli ("DiNapoli"),

seeks *habeas corpus* relief pursuant to 28 U.S.C. § 2254, as amended by the

Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA").  Petitioner asserts

that the Massachusetts Supreme Judicial Court ("SJC"), in upholding his conviction,

unreasonably applied clearly established federal law.  *See* 28 U.S.C. § 2254(d)(1).

Among other claims, Petitioner alleges that his constitutional right to an impartial jury

was violated by pretrial publicity.

        As required by the *habeas* rules, the petition is directed at the superintendent of

the prison where Petitioner is housed ("Respondent").  *See* Rules Governing Section

2254 Cases in the United States District Courts, Rule 2(a).[1]  The petition has been

_____

        [1]  Initially, Petitioner also named Massachusetts Attorney General Thomas F.
Reilly as a second respondent.  On January 31, 2005, District Judge Michael A. Ponsor

referred to this court for a report and recommendation. *See* 28 U.S.C. § 636(b)(1)(B).

For the reasons provided below, the court will recommend that the petition be denied.

I. B̲ACKGROUND̲

On March 16, 2001, Petitioner was found guilty of DiNapoli's murder and

thereafter sentenced to life in prison without the possibility of parole. Petitioner

appealed to the SJC which directly reviews all first-degree murder convictions in

Massachusetts. *See* Mass. Gen. L. ch 278, § 33E.

In a decision dated December 11, 2003, the SJC upheld Petitioner's conviction.

*Commonwealth v. Morales*, 800 N.E.2d 683 (Mass. 2003). In doing so, the SJC made

the following findings of fact which, for *habeas* purposes, *see* 28 U.S.C. § 2254(e)(1),

are presumed to be correct:

> John DiNapoli, the victim, was a twenty-three year veteran
> of the Holyoke police force. On the morning of December
> 22, 1999, while driving in an unmarked police cruiser,
> DiNapoli heard a radio dispatch reporting a fight at the
> corner of Sargent and Walnut Streets. Unarmed and in
> plain clothes, he transmitted to the dispatcher that he would
> "see what was going on." On arriving at the scene, he saw
> [Petitioner], whose appearance matched the dispatcher's
> description of one of the men involved in the altercation. As
> [Petitioner] fled on foot, DiNapoli gave chase in the cruiser.
> At some point, [Petitioner] stopped running and began firing
> a gun at the cruiser. DiNapoli put the cruiser in reverse and
> slowly backed away, but [Petitioner] pursued the vehicle and
> continued to fire. DiNapoli had been shot five times and
> could not be resuscitated by paramedics who were called to
> the scene. (There were ten bullet holes in DiNapoli's
> vehicle.) [Petitioner] fled, discarded his gun, and managed
> to make his way to Scranton, Pennsylvania, where he was
> apprehended by local police on December 27, 1999, and

---

allowed, without opposition, the Attorney General's motion to dismiss.

confessed to them that he had shot Officer DiNapoli.
Massachusetts State police traveled to Pennsylvania and
[Petitioner] also gave a statement to them.

*Morales*, 800 N.E.2d at 687.

The SJC made the following additional findings of fact with regard to Petitioner's

pretrial publicity claim:

> The bulk of the publicity cited by [Petitioner] to support his motion
> was printed in the Springfield Union-News, a daily newspaper in
> Hampden County, which reached approximately 136,000 readers.
> Starting the day after the shooting, the Union-News published
> stories about DiNapoli, about [Petitioner]'s flight and capture, and
> about public reaction to the shooting.  On December 27, 1999, the
> date of [Petitioner]'s arrest, one article reported that an attendee at
> DiNapoli's wake said that "it was the first time they heard people
> shouting hooray in a funeral home."  Another story the same day
> reported that "hundreds of people" waited outside in the cold to pay
> their respects to DiNapoli.  Subsequent articles in December,
> 1999, referred to [Petitioner]'s confession and prior criminal history.
> In January, 2000, Union-News stories detailed the establishment of
> a memorial fund in DiNapoli's honor and the expected passage of a
> Holyoke city council ordinance which called for affixing "WWJDD"
> decals ("What would John DiNapoli do") on all police cruisers.
> Follow-up stories about DiNapoli's family and posthumous honors
> appeared in the Union-News at least until July, 2000, and news
> about [Petitioner] also received continuing coverage.  [Petitioner]
> further cited over one dozen stories about DiNapoli's death in the
> Boston Globe and Boston Herald including a December 30, 1999,
> Herald report bearing the headline: "DA: Suspect knew DiNapoli
> was a cop."  In addition, [Petitioner] points to media coverage in
> the Telegram & Gazette (a newspaper in the adjacent county of
> Worcester with a circulation of 147,000), television reports
> (including a local broadcast of DiNapoli's funeral), and a "web
> board," on which readers posted comments such as "He is Puerto
> Rican Trash" and "I actually hope he gets off . . . so he can get
> what he really and truly deserves, AN AUTOPSY."
>
> As a result of this publicity, the vast majority of the venire
> was aware to some extent of the events surrounding
> DiNapoli's death.  Of the sixteen jurors eventually

> empanelled, all knew about his death and all but one
> explicitly stated that they had received at least some of their
> information from the extensive media coverage.

*Id.* at 687-88.  Further facts found by the SJC with respect to this and several of

Petitioner's other claims are addressed more fully below.

The petition and accompanying memorandum of law contain four constitutional

claims within six separate grounds.  First, Petitioner alleges that pretrial publicity

violated his right to trial by an impartial jury (Ground A).  Second, Petitioner alleges that

his constitutional right to remain silent was violated when the prosecutor commented on

his failure to testify (Ground B).  Third, Petitioner alleges that his right to present a

defense was violated in a variety of ways (Grounds C and D).  Fourth, Petitioner

alleges a number of violations of his right to a fair trial (Grounds E and F).

## II.  DISCUSSION

Following Petitioner's lead, the court addresses each claim in turn.  In the end,

the court will conclude that none of the claims warrant *habeas corpus* relief.  First,

however, the court will describe Petitioner's arguments in light of the standards which

must be applied in reviewing the SJC's December 11, 2003 decision.

### A.  STANDARDS OF REVIEW

In the introduction to his memorandum of law (Document No. 2 (hereinafter

"Petitioner's Brief") at 1-2), Petitioner asserts that his petition arises under that part of

28 U.S.C. § 2254(d) which allows for *habeas corpus* relief if he proves the "State

court['s] . . . adjudication" of his claims involved "an unreasonable application of . . .

clearly established Federal law" (§ 2254(d)(1)) or "was based on an unreasonable

4

determination of the facts" (§ 2254(d)(2)).[2]  Other than a boilerplate description of these

standards (*id.* at 13-15), however, Petitioner fails to describe how either applies.

Rather, Petitioner merely reproduces the brief he submitted to the SJC minus several

references to Massachusetts case law.  (Compare *id.* at 15-42 with Respondent's

Supplemental Answer ("SA") at 36-77.)  This, in the court's estimation, is a risky

strategy insofar as both *habeas* standards place the burden on Petitioner to

demonstrate how the "adjudication" of his claims by the "State court" -- here, the SJC's

December 11, 2003 decision -- was in error.  28 U.S.C. § 2254(d).  *See also Bell v.*

*Cone*, 535 U.S. 685, 693 (2002) (one purpose of AEDPA is "to prevent federal habeas

retrials") (citation and internal quotation marks omitted).

As to section 2254(d)(1), the Supreme Court has "made it clear that '[u]nder the

"unreasonable application" clause, a federal *habeas* court may grant the writ if the state

court identifies the correct governing legal principle from [the Supreme] Court's

---

[2]  In full, section 2254(d) states as follows:

(d) An application for a writ of habeas corpus on behalf of a person in custody
pursuant to the judgment of a State court shall not be granted with respect to any
claim that was adjudicated on the merits in State court proceedings unless the
adjudication of the claim--

(1) resulted in a decision that was contrary to, or involved an
unreasonable application of, clearly established Federal law, as
determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable
determination of the facts in light of the evidence presented in the State
court proceeding.

28 U.S.C. § 2254(d).

decisions but unreasonably applies that principle to the facts of the prisoner's case.'"
*McCambridge v. Hall*, 303 F.3d 24, 36 (1st Cir. 2002) (quoting *Williams v. Taylor*, 529
U.S. 362, 413 (2000) (O'Connor, J.)) (alterations by First Circuit).  The Court also
"clarified that unreasonableness must be an objective standard and that an erroneous
or incorrect application is not necessarily an unreasonable application." *Id.* (citing
*Williams*, 529 U.S. at 410, 411).  At the very least, a federal *habeas* court must inquire
"whether the state decision is in error," with close questions barring *habeas* relief.  *Id.*
*See also id.* at 35 (rejecting the argument that the *habeas* court "must review the
[issues] *de novo*, rather than look to whether the state court's determination is
unreasonable"); *Sepulveda v. United States*, 330 F.3d 55, 66 (1st Cir. 2003) ("[S]ection
2254 . . . requires [state] prisoners to bear a different burden; they must demonstrate
that the state court's adjudication of the claim 'resulted in a decision that was contrary
to, or involved an unreasonable application of, clearly established Federal law, as
determined by the Supreme Court of the United States.'").  Put differently, the standard
outlined in section 2254(d)(1) "reflects congressional concern that, in the interests of
comity, federal courts should defer to reasonable state-court judgments anent state
prisoners -- even when those judgments are arguably erroneous."  *Sepulveda*, 330
F.3d at 66.  Unfortunately, Petitioner never argues how "the state decision" here was
unreasonable, let alone erroneous.

   Nor does Petitioner ever address subsection (d)(2) which, as indicated, allows
for *habeas* relief if the petitioner can prove that the "State court . . . adjudication" of his
claims resulted in a decision that "was based on an unreasonable determination of the

facts." 28 U.S.C. § 2254(d)(2).  To be sure, Petitioner acknowledges that subsection

(d)(2) "applies exclusively to determinations of basic, primary, or historical facts, not to

mixed questions of fact and law, which are more amenable to analysis under section

2254(d)(1)."  *Dolinger v. Hall*, 302 F.3d 5, 8 n.5 (1st Cir. 2002) (citations and internal

quotation marks omitted).  But Petitioner never challenges any of the SJC's findings of

fact.  Thus, Petitioner seems content to proceed solely under the unreasonable

application prong of subsection (d)(1), leaving it to the court to determine whether he

has sustained his burden with respect thereto.

B.  Application

      For the reasons which follow, the court believes that Petitioner has not proven,

pursuant to 28 U.S.C. § 2254(d)(1), that the SJC's December 11, 2003 decision

"involved an unreasonable application of . . . clearly established Federal law."  In the

end, therefore, the court will recommend that his request for *habeas* relief be denied

with regard to each of his claims.

      1.  Pretrial Publicity (Ground A)

      Petitioner's main contention is that pretrial publicity violated his right to trial by

an impartial jury.  In order to prove such a claim, Petitioner must demonstrate at least

one of the following: (1) "the trial itself was conducted in a 'circus like' atmosphere"; (2)

"the community was so saturated with inflammatory publicity as to call into question the

jurors' assertions and require [the court] to presume their partiality"; or (3) "the actual

jurors who sat on the case possessed fixed opinions that prevented them from judging

impartially [his] guilt or innocence."  *United States v. Moreno-Morales*, 815 F.2d 725,

731 (1st Cir. 1987).  Here, however, there is no allegation that the trial itself was "circus-like."  Thus, Petitioner is left with trying to prove that the SJC unreasonably applied federal law with respect to either community saturation with inflammatory publicity or actual juror bias.

### a. *Community Saturation with Inflammatory Publicity*

As Petitioner must acknowledge, it is difficult to prove community saturation with inflammatory publicity.  For one thing, a court must presume that the jury was impartial unless the trial itself was "utterly corrupted by press coverage."  *Murphy v. Florida*, 421 U.S. 794, 798 (1975).  Moreover, such publicity must be so inflammatory and extensive that it overcomes the presumption of jury impartiality, for example, when a television station repeatedly broadcasts a defendant's confession.  *Rideau v. Louisiana*, 373 U.S. 723, 725 (1963).  News coverage which is largely factual is insufficient.  *Murphy*, 421 U.S. at 799.  *See also United States v. Angiulo*, 897 F.2d 1169, 1181 (1st Cir. 1990) (observing that news articles need not be devoid of any slant, only that they are not "emotionally charged").  Moreover, the potentially inflammatory impact of publicity will be mitigated where it occurs several months or more prior to trial.  *See Murphy*, 421 U.S. at 799.

Petitioner must also show that the publicity was widespread.  For example, in *Irvin v. Dowd*, 366 U.S. 717, 723 (1961), over two-thirds of the potential jurors thought the defendant was guilty.  In contrast, bias exhibited by twenty-five to forty-two percent of the non-seated venire has been deemed insufficient "to call into question the seated jurors' assertions of impartiality."  *Moreno-Morales*, 815 F.2d at 735.

Here, there is little dispute that pretrial publicity was widespread.  As the SJC found, most of the thirty-eight articles from the local newspaper cited by Petitioner reached much of the Hampden County jury pool.  *See Morales*, 800 N.E.2d at 687. Petitioner, however, failed to convince the SJC that the publicity was so inflammatory as to undermine the verdict.  This court has reviewed the entire record and, for at least two reasons, finds the SJC's findings to have been a reasonable application of clearly established federal law.

First, the court believes that both the record and relevant caselaw support the SJC's determination that the media coverage, although extensive, "was primarily factual, summarizing the incident, the charges against [Petitioner], and his arrest in Pennsylvania."  *Id.* at 688.  True, as the SJC noted, "[t]he coverage frequently did mention [Petitioner]'s confession, his criminal record, and the fact of the victim's twenty-one year service as a police officer, his popularity in the community, and the memorials in his honor."  *Id.*  These references, however, were "significantly short of the type of emotionally charged, inflammatory, sensationalistic coverage needed to support a presumption of prejudice."  *Id.* (citation and internal quotation marks omitted). "Further," the SJC continued, "the majority of the articles that contained emotional material appeared in the immediate aftermath of the murder while empanelment did not start until about fourteen months later."  *Id.*  "By that time, reporting on the subject had decreased and was more factually based."  *Id.* at 688-89 (citation omitted).  In other words, the SJC concluded, "the intensity of the media coverage that existed in December, 1999, had dissipated over time."  *Id.* at 689.

Second, there is ample support in the record, again in light of relevant caselaw, to support the SJC's conclusion that there was little "difficulty in empanelling jurors who appear[ed] impartial." *Id.* (citing *Angiulo*, 897 F.2d at 1181-82). In reaching this conclusion, the SJC found as follows:

> We have reviewed the entire record and only fourteen jurors, or approximately twenty-five percent of the venire, were disqualified for exposure to media coverage. (The remaining jurors excused for cause were excused for reasons such as feelings about police officers, relationship to victim, bias against a defendant who did not testify or present evidence, or general feelings about guns or drugs). We have previously rejected claims of presumptive prejudice even though significantly higher percentages of prospective jurors have been excused at least in part due to prejudice from exposure to publicity about the case.

*Id.* (citations and footnote omitted). At bottom, the SJC was unable to "say that the raw number of disqualifications, in itself, causes us to question the impartiality of the qualified jurors." *Id.* (citation and internal quotation marks omitted). As a result, the SJC concluded that Petitioner had not met his burden of demonstrating "that there was general and substantial prejudgment to such an extent that it was practically impossible to empanel an impartial jury." *Id.* (citations, footnote, and internal quotation marks omitted). Looked at in its entirety, the SJC's decision was clearly a reasonable application of the federal law cited above.

      b. *Actual Juror Bias*

This court also believes that the SJC's conclusion regarding actual juror bias was a reasonable application of clearly established federal law. Again, as Petitioner must per force acknowledge, it is extremely difficult to prove actual juror bias in light of

10

the presumption of juror impartiality. *Irvin*, 366 U.S. at 723. Moreover, even with

substantial publicity, "[i]t is sufficient if the juror can lay aside his impression or opinion

and render a verdict based [solely] on the evidence presented in court." *Id.* Absent

significant evidence -- in *Irvin*, for example, the Supreme Court found actual bias where

eight of twelve seated jurors and a large majority of potential jurors believed the

defendant was guilty -- bias is nearly impossible to prove, particularly when a trial court

takes reasonable precautions to screen jurors during *voir dire*. *See United States v.*

*Brandon*, 17 F.3d 409, 441 (1st Cir. 1994).

   As it turns out, Petitioner does not explicitly claim that those eventually seated

on his jury were actually biased. At best, this claim is embedded in his argument. *See,*

*e.g.*, Petitioner's Brief at 23 (noting that "100%" of the seated jurors had heard of the

facts of the case). *See also Morales*, 800 N.E.2d at 688 ("Of the sixteen jurors

eventually empanelled, all knew about his death and all but one explicitly stated that

they had received at least some of their information from the extensive media

coverage."). In any event, the SJC did not unreasonably apply federal law when it

addressed the claim.

   For one thing, the SJC specifically found that, given "the totality of the

circumstances," pretrial publicity did not deprive Petitioner of his right to a fair trial. *Id.*

at 690. The SJC also found that the trial judge "extensively probed the jurors to discern

their exposure to the pretrial publicity, their knowledge of the murder and [Petitioner]'s

arrest, whether they were emotionally affected by the crime, whether they had

discussed the case or formed opinions, and whether they would be uncomfortable if

[Petitioner] were acquitted or affected if he did not testify or present evidence." *Id.* (footnote omitted). Moreover, the SJC found that the trial judge "asked further questions when a particular response indicated such was necessary or when counsel so requested" and that "[o]nly those jurors whose answers indicated their disinterest and freedom from emotional or intellectual commitment were seated." *Id.* (citations and internal quotation marks omitted). Further, the SJC found that Petitioner's "repeated expression that he was 'satisfied' with each seated juror and his failure to exhaust his peremptory challenges further belie[d] any claim of juror partiality." *Id.* (citation omitted).

In sum, the court believes that there is reasonable support in the federal law for the SJC's ultimate conclusion on this score, to wit, that "[t]he record here contains no suggestion that the jury members were less than fair and impartial." *Id.* Accordingly, the court will recommend that Petitioner's pretrial publicity claim be denied.

2. <u>Right to Remain Silent (Ground B)</u>

Petitioner next contends that the SJC unreasonably applied clearly established federal law when it found no fault in the prosecutor's allegedly prejudicial comment on Petitioner's "failure" to testify. Petitioner focuses on the following comment during the prosecutor's closing argument: "If it was self-defense, you would think he would want to tell the truth about how the shooting actually happened. If he's acting in self-defense, then isn't he . . . going to want to say the truth about how the shooting happened?" *Id.* at 65.

Taken out of context, the prosecutor's comment could raise an eyebrow.

12

However, the SJC's contextual discussion of the comment dispels this result:

> In the context of the argument being made, the prosecutor's reference is not to [Petitioner's] failure to testify, but to the fact that when [Petitioner] gave a statement to the police in Scranton, Pennsylvania, he never mentioned anything related to self-defense.  In this way, the prosecutor permissibly suggested that [Petitioner's] self-defense theory was a later contrivance.

*Id.* at 696.

The record amply supports these undisputed findings.  More importantly, Petitioner has offered no evidence that the prosecutor's statement impaired his defense.  By failing to rebut the SJC's finding that the prosecutor did not comment on his silence at trial, Petitioner can hardly claim that the SJC unreasonably applied clearly established federal law.  The court, therefore, will recommend that Petitioner's request for *habeas* relief with respect to Ground B be denied.

3.  Right to Present a Defense (Grounds C and D)

Petitioner contends in Grounds C and D that the trial court impaired his right to present arguments in support of a claim of self-defense.  Petitioner focuses on three instances in particular: (1) the trial judge's refusal to question jurors about self-defense, (2) the prosecutor's alleged "witness vouching," and (3) the trial judge's failure to declare a mistrial after one witness gave improper self-defense testimony.  In the court's view, none of these instances warrants *habeas* relief.

a.  *Refusal to Ask Self-Defense* Voir Dire *Questions*

Petitioner first claims that his right to present a defense was violated when the trial judge refused to ask the following *voir dire* questions by Petitioner: "Have any of

13

you ever found it necessary to defend yourself from physical harm?" and "What have you been taught while growing up about self-defense?" These questions, Petitioner contends, would have elicited more substantial responses than the leading questions actually asked.

As with his other arguments, however, Petitioner neither rebuts the SJC's fact-finding nor cites any authority challenging the SJC's application of federal law. Nor, in this court's view, would he have been successful. The SJC, this court believes, properly deferred to the trial court's discretion because Petitioner "ha[d] not shown a substantial risk of juror bias against" self-defense that might require a more searching *voir dire* inquiry. *Morales*, 800 N.E.2d at 694. Accordingly, the court has little choice but to recommend that Petitioner's request for *habeas* relief with respect to his *voir dire* argument be denied.

b. *Alleged Witness Vouching*

Petitioner also contends that the SJC unreasonably applied clearly established federal law in finding that the prosecutor had not impermissibly "vouched" for a witness. At trial, Petitioner points out, the judge allowed the prosecutor himself to read a small excerpt of Petitioner's statement to a police witness, as the SJC explained, after the witness "lost his composure" while reading the statement. *Morales*, 800 N.E.2d at 694. "[I]t was necessary," the SJC stated, "that parts of the statement be admitted into evidence so that the jury could understand further questions . . . about the circumstances of the questioning." *Id.* This approach, Petitioner argues, enabled the prosecutor to add "unjustified authenticity" to the witness' statement.

14

Petitioner, however, again fails to challenge the SJC's findings with respect to this argument or otherwise show how it unreasonably applied clearly established federal law.  In essence, the SJC found that the prosecutor did not vouch for the witness because he "simply read a portion of the statement.  He did not express any belief in the credibility of the [witness or Petitioner] . . . and he did not indicate any knowledge apart from the evidence."  *Id.*  For present purposes, Petitioner has simply failed to demonstrate that the SJC "improperly deferred to the discretion of the trial court or inappropriately determined that the prosecutor added nothing extraneous or improperly imposed the "imprimatur of the Government" upon the statement.  *See United States v. Young*, 470 U.S. 1, 18-19 (1985) (citation omitted).  Accordingly, the court will recommend that Petitioner's request for *habeas* relief with respect to his witness vouching claim be denied.

### c.  *Failure to Grant Mistrial After Improper Self-Defense Testimony*

Petitioner further argues that his right to present a defense was violated when the trial court failed to grant a mistrial after a witness gave certain testimony regarding self-defense.  The court notes, however, that the SJC addressed this issue only in the context of Petitioner's ineffective assistance of counsel claim (*i.e.*, that his counsel should have moved for a mistrial).  Since Petitioner does not mention ineffective assistance of counsel in his petition, the court need not address it.  Nevertheless, the court believes that his counsel's failure to move for a mistrial does not warrant *habeas* relief.

For one thing, the SJC's fact-finding on this issue goes unchallenged.  As

Respondent notes, the SJC found that a witness, "in response to the question 'What was [Officer DiNapoli] doing [when the defendant was shooting at him]?' answered, 'Honestly, the police officer have [sic] no chance to react.'" *Morales*, 800 N.E.2d at 695 (alteration added by SJC). Continuing, the SJC observed that "[d]efense counsel objected, the judge sustained the objection, directed the jury to disregard the answer and reminded them that the 'answer is not evidence for your consideration.'" *Id.*

Petitioner also fails to acknowledge that the SJC gave "due deference" to his counsel and concluded that "his strategy was not manifestly unreasonable." *Id.* Moreover, as the SJC found, "[a] request for a mistrial probably would have been futile, and . . . [unnecessary given] the judge's forceful instruction" to the jury to disregard the testimony. *Id.* The SJC thus followed federal law regarding the adequacy of counsel's assistance, *see Strickland v. Washington*, 466 U.S. 668 (1984), Petitioner's cursory reference to that case notwithstanding. The court, accordingly, will recommend that *habeas* relief with respect to this issue -- and hence all of Grounds C and D -- be denied.

### 4. Right to Fair Trial (Grounds E and F)

Finally, Petitioner claims that he was denied his right to a fair trial in light of the following events: (1) witness intimidation, (2) publication of the jurors' names and photographs, (3) one juror's misconduct, and (4) admission of evidence that Petitioner threatened to kill another person. The court will address each in turn and, once again, conclude that *habeas* relief is not warranted.

#### a. *Witness Intimidation*

16

Petitioner first claims that police intimidated a witness during defense questioning.  The SJC found, however, that the witness had "overslept and missed an appointment for an interview at the district attorney's office."  *Morales*, 800 N.E.2d at 691.  Continuing, the SJC found as follows: "Police officers went to his home where coincidentally he was being interviewed by defense investigators.  After reminding him of his missed appointment and of the fact that he could speak to the defense investigators or not, as he wished, the police left his home."  *Id.*  Petitioner has failed to challenge these findings.

Petitioner also alleges that the subject witness ignored future defense inquiries. Petitioner fails to note, however, that the SJC rejected this claim.  As the SJC determined, "'[a] couple of days' later, the defense investigators . . . completed their questioning of [the witness]."  *Id.*  Since "the incident was fully explored by counsel on cross-examination" of the witness, the SJC found that police did not interfere with Petitioner's right to present a defense.  *Id.*  By failing to rebut the SJC's finding that no witness intimidation occurred, Petitioner cannot establish that the SJC unreasonably applied clearly established federal law in this regard.  The court, therefore, will recommend that Petitioner's request for *habeas* relief with respect to his witness intimidation claim be denied.[3]

b. *Publication of Juror Identities*

─────────────

[3]  Although the SJC did not discuss Petitioner's related allegations, they also lack support in the record.  For example, while Petitioner claims that police advised witnesses to ignore subpoenas, they actually merely told witnesses not to arrive during jury selection.  (See Transcript Volume IV at 90.)

17

Petitioner next argues that the SJC unreasonably applied clearly established federal law in upholding the trial court's permitting the media's publication of juror photographs, which ostensibly increased the "pressure to convict."  (Petitioner's Brief at 34-35.)  Again, however, Petitioner does not dispute the SJC's following findings of fact:

> Shortly after opening statements . . . [d]espite the judge's order that the media not photograph the jurors' faces  . . . juror no. 8 informed the judge that he had been recognized in a newspaper photograph. . . . He stated that the publication of the picture would not affect his impartiality.  All parties indicated they were satisfied with the juror's remaining on the panel[.]

*Morales*, 800 N.E.2d at 691.  The SJC also found "no indication in the record that any other juror . . . was aware of the photograph."  *Id.* at 691-92.  Largely deferring to the trial court's discretion, the SJC found that the publication was inconsequential.  *See id.*

To his credit, Petitioner cites *Sheppard v. Maxwell*, 384 U.S. 333 (1966), in support of his argument.  That case, however, is distinguishable.  In *Sheppard*, "newspapers published the names and addresses of the veniremen," who later received many letters and calls about the case.  *Id.* at 342.  Also, during the trial, newspapers continued to photograph jurors and discussed an alternate juror's private life.  *Id.* at 345.  Obviously, such publicity was far more pervasive than any publicity at issue here.  In the absence of supporting caselaw, Petitioner fails to show that the SJC unreasonably applied clearly established federal law in this regard.  Accordingly, the court will again recommend that his request for *habeas* relief be denied.

c.  *Juror Misconduct*

18

Petitioner next contends that the SJC unreasonably applied clearly established federal law in upholding the trial court's decision not to remove or further investigate a distracting juror. Again, however, Petitioner fails to rebut the SJC's fact-finding in any way. The SJC found as follows:

> [T]hree jurors had complained about the behavior of juror no. 13. This juror had reportedly been "distracting" the other jurors by mouthing answers to questions, rolling her eyes, and moving her head in agreement or disagreement with testimony. . . . The judge . . . eventually concluded that "benign neglect" was the wisest course of action.

*Morales*, 800 N.E.2d at 692. The SJC determined that the trial judge's decision was "within his discretion" because there was "no reason to believe that juror no. 13's outward reactions to testimony indicated that she was ignoring the judge's instructions or was not listening to all the testimony and according it appropriate weight." *Id.*

Petitioner cites no authority as to why this determination should be overturned. Rather, he merely "posits that this problem would not have arisen in another venue." *Id.* The SJC, however, found "nothing to suggest that this juror's outward behavior was the result of pretrial publicity," *id.,* and, in doing so, once again reasonably applied federal law. *See, e.g., United States v. Lemmerer*, 277 F.3d 579, 591-92 (1st Cir. 2002) ("Trial judges enjoy broad discretion in determining how to best respond to problems of jury management, and normally [the court] will not reverse unless the judge's choice . . . was patently unreasonable.") (citations omitted). Accordingly, the court will recommend that Petitioner's request for *habeas* relief with respect to juror misconduct be denied.

19

d. *Evidence of Petitioner's Threat Against Third Party*

Finally, Petitioner argues that his right to a fair trial was violated when the trial court admitted evidence that he threatened to kill another person. Again, Petitioner fails to rebut the SJC's following findings of fact:

> Evidence was admitted that after [Petitioner's] arrest, . . . [he] stated that Hector Cabrera had given him the firearm . . . . [Petitioner] further stated that if Cabrera "hadn't talked, no one would have known. They wouldn't have been able to find me right away." He also said, "It's better if I wait up until he ends up around here and I will kill him."

*Morales*, 800 N.E.2d at 692-93 (footnote omitted). The SJC further found that Petitioner's statement was admissible as "evidence of consciousness of guilt." *Id.* at 693. The SJC also observed that Petitioner "received an undeserved benefit when the judge did not permit [the statement] to be read to the jury," merely letting the prosecutor quote from it during closing argument. *Id.*

In this court's view, the SJC again appropriately deferred to the trial judge's discretion. As Petitioner must concede, trial courts may properly admit evidence of threats to kill a potential witness to demonstrate consciousness of guilt. *See United States v. Copeland,* 321 F.3d 582, 597 (6th Cir. 2003); *United States v. Young*, 248 F.3d 260, 272 (4th Cir. 2001); *United States v. Pina*, 844 F.2d 1, 9 (1st Cir. 1988). The court, therefore, will recommend that Petitioner's request for *habeas* relief regarding admission of the threat -- and, as a result, all of Grounds E and F -- be denied.

III. CONCLUSION

For the reasons stated, the court recommends that the petition for *habeas*

20

*corpus* relief be denied and that judgment enter in Respondent's favor.[4]


DATED: October 11, 2005

                                              /s/ Kenneth P. Neiman  
                                            KENNETH P. NEIMAN
                                            U.S. Magistrate Judge

---

[4] The parties are advised that under the provisions of Rule 3(b) of the Rules for United States Magistrates in the United States District Court for the District of Massachusetts, any party who objects to these findings and recommendations must file a written objection with the Clerk of this Court **within ten (10) days** of the party's receipt of this Report and Recommendation. The written objection must specifically identify the portion of the proposed findings or recommendations to which objection is made and the basis for such objection. The parties are further advised that failure to comply with this rule shall preclude further appellate review by the Court of Appeals of the District Court order entered pursuant to this Report and Recommendation. *See Keating v. Secretary of Health & Human Services*, 848 F.2d 271, 275 (1st Cir. 1988); *United States v. Valencia-Copete*, 792 F.2d 4, 6 (1st Cir. 1986); *Scott v. Schweiker*, 702 F.2d 13, 14 (1st Cir. 1983); *United States v. Vega*, 678 F.2d 376, 378-379 (1st Cir. 1982); *Park Motor Mart, Inc. v. Ford Motor Co.*, 616 F.2d 603, 604 (1st Cir. 1980). *See also Thomas v. Arn*, 474 U.S. 140, 154-55 (1985). A party may respond to another party's objections within ten (10) days after being served with a copy thereof.