UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

Civil Action No. 04-30191-MAP

| | |
|---|---|
| Eddie O. Morales, ) | |
|     Petitioner ) | **MORALES'S OBJECTIONS TO** |
| ) | **MAGISTRATE'S REPORT AND** |
|        v. ) | **RECOMMENDATIONS** |
| ) | |
| Lois Russo, Superintendent ) | |
|     Respondent ) | |

Morales objects to Magistrate Judge Neiman's Report and Recommendations (hereinafter, MRR) that his petition for writ of habeas corpus be denied. This Court reviews the MRR *de novo* and without deference.[1]

### Summary

Morales's petition for a write of habeas corpus should be granted. The Magistrate's Report and Recommendation, to the contrary, is based on important errors both in misapplying the law and misunderstanding the record.

First, the pretrial publicity in this case was immense and it was prejudicial. Even the MRR found that there was "little dispute that pretrial publicity was widespread." The trial atmosphere was "circus like," the media coverage was sensationalist and prejudicial, and at least one juror was shown

---

[1] United States v. Raddatz, 447 U.S. 667, 674 (1980); Gioiosa v. United States, 684 F.2d 176, 178 (1st. Cir. 1982); 28 U.S.C. § 636(b)(1)(C).

1

to be biased.

Second, the prosecutor's comment on the Petitioner's failure to testify deprived him of his constitutional right to silence, and the Supreme Judicial Court (hereinafter, SJC) unreasonably applied that clearly established federal law.

Third, the Petitioner's entire case was based on self-defense, and the trial court limited his ability to so defend. The trial court refused to ask potential jurors in voir dire their willingness to accept self-defense, the prosecutor vouched for his witness on this issue, and one witness's improper testimony struck at the heart of the self-defense issue. The recommendations of the Magistrate must be rejected on these issues because the SJC failed to reasonably apply federal law.

Finally, the MRR simply errs in holding that the Petitioner's constitutional right to a fair trial was not violated where there was police intimidation of witnesses, where the media published the names and photographs of jurors prior to trial, and where the trial court admitted alleged threats to kill another person.

2

**Argument**

I. THE DEFENDANT WAS DENIED HIS CONSTITUTIONAL RIGHT TO TRIAL BEFORE AN IMPARTIAL JURY WHERE HAMPDEN COUNTY WAS SATURATED WITH EXTENSIVE, INFLAMMATORY PRETRIAL PUBLICITY, WHERE NINETY-EIGHT PER CENT OF THE JURY POOL WAS EXPOSED TO THE PUBLICITY, WHERE THE JURY VOIR DIRE WAS INADEQUATE, WHERE DEFENSE COUNSEL WAS FORCED TO ACCEPT SOME JURORS "RELUCTANTLY" IN AN EFFORT TO ACHIEVE A FAIR AND REPRESENTATIVE CROSS-SECTION, WHERE FIFTY-SEVEN PER CENT OF THE VENIRE WAS EXCUSED ON SOME GROUND OF PARTIALITY, INDICATING STATISTICALLY THAT THE SEATED JURY WAS SUBCONSCIOUSLY PARTIAL, WHERE AT LEAST ONE JUROR POSSESSED A FIXED OPINION, AND WHERE THE TRIAL COURT ABUSED DISCRETION IN NOT CHANGING VENUE, ELEVATING THE "PUBIC INTEREST" IN THE CASE OVER THE DEFENDANT'S RIGHT TO AN IMPARTIAL JURY.

The MRR correctly states that in order to prevail on a claim of violation of constitutional right to trial by an impartial jury on the basis of pretrial publicity, a petitioner must demonstrate at least one of the following : (1) "the trial itself was conducted in a 'circus-like' atmosphere;" (2) "the community was so saturated with inflammatory publicity as to call into question the jurors' assertions and require [the court] to presume their partiality;" or (3) "the actual jurors who sat on the case possessed fixed opinions that prevented them from judging impartially [his] guilt or innocence." United States v. Moreno-Morales, 815 F.2d 725, 731 (1st Cir. 1987). The SJC here unreasonably applied federal law with respect to community saturation with inflammatory publicity as well as actual juror bias, in this "circus like" atmosphere.

A. The Trial was Conducted in a "Circus Like" Atmosphere.

The Petitioner does not concede, as suggested by the MRR,

3

that the atmosphere of his trial was not "circus like." Indeed, in addition to the pervasive, highly prejudicial, and unrelenting media coverage, the newspaper went so far as to publish photographs of the jurors. On Friday, March 9, the first day of testimony, the local newspaper requested the names and addresses of the jurors. Both defense counsel and the district attorney objected, and the Court postponed the issue to Monday. Then on Monday, March 12, the second day of testimony, the Court was advised that the local newspaper had published photographs of the jurors in the Saturday edition. The Court was "extremely distressed," but in the end, did nothing.

Publication of photographs of the jurors during trial in such an emotionally fraught trial had to have had the effect of compelling conviction. Morales was, in this respect, denied his right to an impartial jury and to a fair trial. U.S. Const. amend. VI, XIV. Now, every juror, knowing that his or her friends and neighbors have identified that they are on the "Eddie Morales jury," felt pressure to convict, pressure to "protect society" by punishing the person who disturbed the social order. Goggin & Hanover, <u>Fair Trial v. Free Press: The Psychological Effect of Pre-Trial Publicity on the Juror's Ability to be Impartial</u>, 38 S.Cal.L.Rev. 672, 677 (1965). At the very least, the recognizable photographs of the jurors faces "exposed them to expressions of opinion from both cranks and friends." <u>Sheppard</u>

4

v. Maxwell, 384 U.S. 333, 353 (1966).

For the MRR to suggest that "[o]bviously" the publicity in Sheppard v. Maxwell, 384 U.S. 333 (1966) "was much more pervasive than any publicity here" misses the point. The SJC's finding that the publication was inconsequential was an unreasonable application of clearly established federal law. "The theory of our system is that the conclusions to be reached in a case will be induced only by evidence and argument in open court, and not by any outside influence" such as the publication of even one juror's face in the newspaper. Patterson v. People of State of Colorado, ex rel. Attorney General, 205 U.S. 454, 462 (1907) (Holmes, J.).

Another instance of the continuing circus-like atmosphere was the October 23, 2000 motion hearing. The Springfield newspaper reported the "explosive situation." With a packed courtroom, the victim's daughter "burst into tears" and said "that Morales had made kissing motions at her and her brother..." The Court actually took testimony from observers in the courtroom to establish that the allegations were not substantiated.

The MRR is simply wrong when it states that there is no allegation that the trial itself was "circus-like." As day after day of the trial unfolded, the judge had an increasingly difficult time with the multitude of extraneous, outside influences on the trial - most of which were created by or at

5

least embellished upon by the media.

B.   The Community was Saturated with Inflammatory Publicity.

Hampden county was wholly saturated with media coverage of this case.[2] The ambit of the dissemination was to virtually every household. The Telegram and Gazette newspapers reached 147,000 readers in the area, and the Springfield Union News-Sunday Republican reached 136,000. Hamden county has a total population of 456,310, and Springfield has 57,769 households. It is, thus, fair to say that the three newspapers' combined circulation of 283,000 was extensive in terms of the potential jury pool in Hamden county. In addition, all of the local television stations carried repeated coverage of the shooting, the massive manhunt, and the arrest, with pictures of the vehicle with numerous bullet holes in the windshield. In short, the name, "Eddie Morales," quickly became a household word.

More importantly, the extensive media coverage was emotionally charged, inflammatory, and sensationalist, and the SJC unreasonably determined that this type of coverage fell short of that needed to support a presumption of prejudice. See Mayola v. Alabama, 623 F.2d 992, 997 (5th Cir. 1980), *quoting*

---

[2] Recent studies have proven that the more pretrial media exposure, the more likely a person is to know about a given case; the more a person knows about a given case, the more likely that person is to form a biased opinion against the defendant; and although other non-media factors may play a role, pretrial publicity is the most serious cause of juror bias. S. Krause, Punishing the Press: Using Contempt of Court to Secure the Right to a Fair Trial, 76 B.U.L. Rev. 537, 560 (1996), *citing* E. Constanti & J. King, The Partial Juror: Correlates and Causes of Prejudgment, 15 Law & Soc. Rev. 9, 11 (1981).

6

United States v. Capo, 595 F.2d 1086, 1090 (5th Cir. 1979), *cert. denied*, 444 U.S. 1012 (1980)) ("Where a petitioner adduces evidence of inflammatory, prejudicial pretrial publicity that so pervades or saturates the community as to render virtually impossible a fair trial by an impartial jury drawn from the community, '[jury] prejudice is presumed and there is no further duty to establish bias'"). Every day the story appeared on the front page of the newspapers, accompanied by very large headlines, describing the "Cop Killer." The confession[3] was reported in newspapers in the days following the arrest, prior to the Suppression hearing, and just before the trial began. As in Rideau, the people of Hampden county "had been exposed repeatedly and in depth to the spectacle of [the Defendant] personally confessing in detail to the crimes with which he was later to be charged." Rideau v. Louisiana, 373 U.S. 723, 726 (1963). Morales's criminal history was reprinted in the newspaper and publicized on television. One headline sensationalized Morales's past as "Many charges, but little jail time." *See* Marshall v. United States, 360 U.S. 310 (1959) (Supreme Court set aside conviction where as here jurors were exposed "through news

---

[3] In one study, a defendant's prior confession was presented to a control group of jurors. Eighty-per cent of juries exposed to prejudicial information rendered guilty verdicts, compared to thirty-nine per cent of "non-exposed" juries. A. Padawer-Singer, Singer, A. Singer, & R. Singer, Legal and Social-Psychological Research in the Effects of Pre-Trial Publicity on Juries, Numerical Makeup of Juries, Non-Unanimous Verdict Requirements, 3:71 Law & Psychology Review 71, 75 (1977).

7

accounts" to information that was not admitted at trial).

Even the Commonwealth argued prior to the Suppression hearing that the "contents of the [suppression] documents are ripe with information that ... would make the issue of a motion for a change of venue a forgone conclusion," and the Commonwealth attempted to close the pre-trial motion hearing and impound the pleadings. But the information had already been disseminated at that point, and as argued by counsel for the newspaper at the suppression hearing, the Court was being asked to put the "toothpaste back into the tube."

1. The Pre-Trial Publicity was Highly Inflammatory.

This case is similar to Coleman v. Kemp, 778 F.2d 1487 (11th Cir. 1985) where the Eleventh Circuit Court of Appeals held that pretrial publicity was so inflammatory and prejudicial as to make a fair trial before an impartial jury impossible. In Coleman, as here, a small rural community, experienced a brutal killing. There, the victims were an innocent family; here, the victim was a very beloved and widely known police officer. The Springfield Union News reported that 6,000 people attended Officer DiNapoli's funeral and that 1,000 people stood for more than an hour "in biting wind" to pay their respects. On January 12, 2000, the Springfield Union News reported that Officer DiNapoli's large memorial fund is a "testament to how well-loved John DiNapoli was." On January 28, 2000, the Springfield Union News reported

8

that the Holyoke City Council was expected to approve an ordinance which would add decals to all cruisers "WWJDD," which stands for "What Would John DiNapoli Do?" On April 27, 2000, the Springfield Union News reported that Officer DiNapoli's name would be added to a memorial, and the details of case were again reprinted. On May 6, 2000, the Springfield Union News reported that Officer DiNapoli was being honored in Washington, D.C., that thirty officers were traveling "at their own expense" to attend, and the details of the confession were again reprinted.

Human interest stories daily kept Officer DiNapoli's name before Hampden County: "Friend's Death Led Patrolman to Join Force." On June 28, 2000, the Springfield Times Union reported that DiNapoli's son was sworn in as a police officer, the chief telling the new officers that "if they did as well as John DiNapoli did over a 30-year career they could be proud." On July 27, 2000, the Springfield Union News reported that DiNapoli's son had joined the Holyoke police force. And, on May 22, 2000, the Springfield Union News ran a story about DiNapoli's daughter' bicycle race in which she stated, "I had him with me on this ride," and the details of the killing were again recanted.

In stark contrast, Morales was repeatedly vilified in the press. When he was arrested, the Springfield Union News reported that "it was the first time they heard people shouting horray in a funeral home." Exemplary of the universal abhorrence for

9

Morales were the e-mail messages sent to the newspaper's web board by newspaper readers: "I actually hope he gets off, and screws up again so he can get what he really and truly deserves, AN AUTOPSY!" "He is Puerto Rican TRASH." Following the Springfield Union News article that Morales was allowed "up to $10,000 in public funds to hire experts," someone wrote to the web board: "$10,000 for defense fund for a two bit piece of garbage maggot with a gold chain that will never change his ways."

For the SJC to determine, and the MRR to find a reasonable application of clearly established federal law that the media coverage was "primarily factual" ignores the sensationalist quality to the months of news stories. For example, the Holyoke police department had hand-cuffed Morales with Officer DiNapoli's own hand-cuffs, and the media devoured such a melodramatic story. Such relentless and pervasive publicity, which painted the victim as the beloved and kind-hearted officer which he was and Morales as a vile, despicable, and remorseless murder cannot help but have subliminally filtered into the conscious and unconscious attitudes of the jury pool of Hampden County when that jury was chosen.

"Prejudice is presumed from pretrial publicity when pretrial publicity is sufficiently prejudicial and inflammatory and the prejudicial pretrial publicity saturated the community where the

10

trial[] [was] held." Coleman, 778 F.2d at 1490. See also United States v. McNeill, 728 F.2d 5, 9 (1st Cir. 1984); Murphy v. Florida, 421 U.S. 794, 802 (1975). Here, the SJC unreasonably applied that well-established federal principle to this case of presumptive prejudice.

    2.    The Entire Jury Pool Was Exposed to the Prejudicial, Inflammatory Media Coverage.

There were eighty-nine total jurors in the two-day venire. Of the eighty-nine jurors, only two had never heard of the facts of this case. And those two were challenged by the Commonwealth. Therefore, 100% of the jury which sat on the case was exposed to the inflammatory pre-trial publicity. Where 100% of the seated panel had been exposed to the invidious publicity, the seated jury panel was "utterly corrupted by press coverage." Dobbert v. Florida, 432 U.S. 282, 303 (1977).

"It is ... the height of naivete to conclude that jurors exposed to such pernicious influence could, notwithstanding their good faith assertions to the contrary, give [the Defendant] a fair and impartial trial free from such pressures." United States v. Morales, 815 F.2d 725, 775 (1st Cir. 1987), Torruella, J., dissenting.

    3.    The Jury Voir Dire was Inadequate to Determine Partiality.

The Court conducted an individual voir dire of the jury during impanelment; however, all but one question were leading

11

questions, and very few jurors answered with any answer other than yes or no. The use of leading and conclusory questions in jury voir dire has been held insufficient to probe and establish jury exposure to publicity. *See* Coleman v. Kemp, 778 F.2d 1487, 1543 (11th Cir. 1985). Jurors should have been asked open-ended questions which would have prompted answers which indicated partiality.

Studies have shown that jury voir dire is an inadequate device to rid the jury of bias because jurors are either silent or they misrepresent their prejudices and preconceptions. J. Mariniello, The Death Penalty and Pre-trial Publicity: Are Today's Attempts at Guaranteeing a Fair Trial Adequate? 8 Notre Dame J.L. Ethics & Pub. Pol'y 371, 381 (1994), *citing* T. Frederick, The Psychology of the American Jury 27 (1987). Here, the voir dire was ineffective in determining bias or partiality, and the only effective means to ensure a fair trial would have been a change of venue.

4. Because so Many Members of the Venire were Partial, Defense Counsel was Forced to Accept Some Jurors "Reluctantly" in an Effort to Achieve A Fair and Representative Cross-Section.

At the end of the voir dire when defense counsel had almost used all of his challenges, he stated for the record that he "reluctantly" accepted juror 6-15 whose cousin was married to a Holyoke police officer, and, despite his "reservations," he "reluctantly" accepted juror 1-7 "because she's a minority more

12

than anything else. I have reservations about her." And, on the second day of jury selection, defense counsel objected in general to the jury venire: "There is a complete lack of apparently minority individuals in the jury pool. Yesterday I think there might have been two or thee of the ninety-six that we brought in yesterday which is clearly not a comparative cross section of the Hampden County community.... There just simply are not any in the pool, and those that are in the pool that have been questioned have been excused."

It was manifestly unfair to have excluded from the jury every potential minority juror except the one accepted by the defense "reluctantly" and "with reservations." Morales was denied his Sixth Amendment right to be tried before a jury drawn from a fair and representative cross-section of the community and, as a Hispanic, his Fourteenth Amendment right to equal protection. However, had venue been changed, jury composition would not have been a problem because there would not have been so many jurors excused as partial.

  5. <u>Statistically, Where Fifty-seven Per Cent of the Venire was Excused, the Remaining Pool Must have been Subconsciously Infected</u>.

Some courts have considered how many non-seated members of the venire admitted to a disqualifying prejudice as an indicator for determining whether community prejudice resulting from publicity may have subconsciously infected the jurors who were

13

seated. *See* Murphy v. Florida, 421 U.S. 794, 803 (1975) (holding that twenty-five per cent of venire partial not suggestive of community so "poisoned against petitioner as to impeach the indifference of jurors").

Studies have shown that even after omitting all of the self-excusals, jurors who had been exposed to highly prejudicial publicity were significantly more likely to convict (fifty-three per cent guilty) than those not exposed (twenty-three per cent guilty). N. Kerr, G. Kramer, J. Carroll, J. Alfini, On the Effectiveness of Voir Dire in Criminal Cases with Prejudicial Pretrial Publicity: An Empirical Study, 40 Am.U.L.Rev. 665, 669 (1991). The psychology of news readers after an event such as a killing is such that they naturally, subconsciously seek a resolution. An event which disturbs the social order such as a crime will "breed instinctive hostility for the person who committed such a disturbance, since the need for order demands that the disturber be caught and punished and that society be protected." Goggin & Hanover, Fair Trial v. Free Press: The Psychological Effect of Pre-Trial Publicity on the Juror's Ability to be Impartial, 38 S.Cal.L.Rev. 672, 677 (1965). In its search for scapegoats, the public "tends to take a harsh, retributive attitude toward criminal offenders or supposed criminal offenders. And newspapers tend to give the public what it wants." Id. at 677, n.29. Those subliminal messages,

14

delivered by the news media, are impossible to eradicate in the potential jury pool.

Here, where almost sixty per cent of the venire were excused for causes which were consciously admitted by them in voir dire, the other forty per cent had to have been subconsciously affected by the pre-trial media circus and its frenzy. Of the eighty-nine potential jurors, fifty-one were excused by the Court for reasons of partiality; seven were challenged by the District Attorney; and fourteen were challenged by defense counsel. The almost sixty per cent of the entire panel excused by the Court on some ground of partiality suggests that the remaining pool was also "poisoned" against Morales and was either consciously or subconsciously biased. The SJC's conclusion that there was little "difficulty in empaneling jurors who appear[ed] impartial," was simply an "unreasonable determination of the facts." 27 U.S.C. § 2254(d)(2).

    6.    <u>The Trial Court Abused Discretion in not Changing Venue Because it Elevated the "Public Interest" in the Case above the Defendant's Constitutional Right to an Impartial Jury</u>.

A change of venue is what Morales requested here,[4] and the

---

[4] The Motion for Change of Venue was argued pre-trial, but the request was fervently repeated at the beginning of the second day of jury selection. Channel 22 the day before showed Morales in a green uniform with a big "P" on his back, it referred to his admissions, and it again ran footage of the funeral procession. Defense counsel pointed out to the Court that the jurors from day two, as opposed to those from day one, were intensely staring at Morales. "It's like - the look is like: So this is the guy that did it. It was very unsettling to me to watch the faces of the jurors... Their eyes never left Mr. Morales.... I don't know what it all means, but it is clear to me

15

trial court abused discretion in its denial and in denial of its reconsideration. Change of venue is the preferred remedy where a community has been saturated with publicity adverse to the defendant. Finnegan v. United States, 203 F.2d 105, 110 (8th Cir.), cert. denied, 346 U.S. 821, reh. denied, 346 U.S. 880 (1953). Change of venue is not only an efficient remedy in terms of judicial resources, but is appropriate in a case such as this where the enormous prejudice against the defendant is only local. Change of venue motions have been said to be "under-utilized" by trial judges, yet studies have shown that their use will "lessen the amount of prejudice [against a defendant because] occupants of a county in which a crime was committed are more likely to be pro-prosecution." J. Mariniello, The Death Penalty and Pre-trial Publicity: Are Today's Attempts at Guaranteeing a Fair Trial Adequate? 8 Notre Dame J.L. Ethics & Pub. Pol'y, 371, 377 (1994).

The "totality of the circumstances" - the extent of publicity, the inflammatory nature of the publicity, the fact that ninety-eight per cent of the venire were aware of the events, and the fact that almost sixty per cent of the venire were excused for partiality - were such that the defendant's trial was not "fundamentally fair." Murphy v. Florida, 421 U.S.

---

that this jury is - I don't know. I don't know what the word is, but it bothers me very much."