794, 799 (1975). Even the Commonwealth realized that the information disseminated at the pre-trial hearing "would make the issue of a motion for a change of venue a forgone conclusion." But by that time, all of the Commonwealth's documents, including "a most extensive police report for which [the Court could] find no justification for its inclusion" had already been disseminated and had "been quoted if not published in the newspaper and reported orally on the television previously."

Moreover, the trial court's reasoning that the "public interest in this case warrants" that the trial take place in Hampden county was entirely misplaced. The "public interest in this case" is not a concern; rather, the only concerns are the defendant's right under the Sixth Amendment and to be tried in the vicinity where the crime occurred, which right was here waived by the Defendant, balanced against his right under the Sixth Amendment to an impartial jury. The Court's elevating "public interest" over the Defendant's most paramount right to be tried "by a panel of impartial, 'indifferent' jurors [whose] verdict must be based upon the evidence developed at trial," Irvin v. Dowd, 366 U.S. 717, 722 (1961), was abuse of discretion.

A constitutional violation, such as a Sixth Amendment violation, by its nature, casts so much doubt on the fairness of the trial process, that it can never be considered harmless

17

error. Statterwhite v. Texas, 486 U.S. 249, 293 (1988). The Court in Coleman v. Kemp, 778 F.2d 1487, 1541 (11th Cir. 1985), *citing* Rideau v. Louisiana, 373 U.S. 723 (1963), held that even overwhelming evidence of guilt was not dispositive in assessing a change of venue claim, reasoning that "[t]o hold otherwise would mean an obviously guilty defendant would have no right to a fair trial before an impartial jury, a holding that would be contrary to the well-established and fundamental constitutional right of every defendant to a fair trial." Where change of venue was a logical and expedient remedy for pre-trial publicity, where it was requested by the Defendant, and where it was even anticipated by the Commonwealth, the SJC's upholding the trial court's denial of the change of venue request represented a misapplication of the Petitioner's federal constitutional right to trial by an impartial jury.

C. <u>Actual Juror Bias</u>

The Petitioner does, as suggested by the MRR, acknowledge that it is difficult to prove actual juror bias. However, here, the SJC's ultimate conclusion that "[t]he record here contains no suggestion that the jury members were less than fair and impartial" is not borne out by the facts.

On the seventh day of trial, three jurors[5] complained that

---

[5] One juror complained to the court officer that the behavior was "troublesome, he can't concentrate, he's trying to look past her; but with the actions that she's doing in the courtroom, that he's having trouble

18

one juror was "demonstrative in her reaction to certain of the testimony." The juror was "answering questions for the witnesses before the witnesses are. She's rolling her eyes. She's making head movements, yes, no; throwing her head back, throwing it to the side...." The Clerk reported to the judge that she had been observing the juror for the past couple of days, and the juror was "mouthing" answers to questions and saying, "No, that's not true" and "That can't be." The juror was "forming answers in her mouth. She's shaking her head from side to side when she doesn't particularly ... agree with something that is said, or about to be said."

The Court grappled with the fact that even though it seemed that the juror had formed conclusions about the case before it was over, whether that inappropriate behavior was disqualifying behavior. Initially the trial judge decided to speak to the juror and ask her if her behavior reflected a lack of partiality, but the trial judge changed his mind. The issue was never investigated or resolved, and the juror completed hearing testimony, deliberated, and rendered a verdict.

The trial court has broad discretion to determine what manner of hearing, if any, is warranted when confronted with allegations of irregularity in the jury's proceeding. A trial

---

concentrating and having trouble ignoring her." Another juror said to the court officer, "I feel the same way. It's very ...[distracting] and I"m having trouble ignoring her and concentrating on the case."

19

court's refusal to conduct some type of investigation into allegations of extrinsic influences upon a jury may constitute reversible error.

Here, the juror's mouthing answers to questions before the witness had time to answer, rolling her eyes, and responding "No, that's not true" to witness answers are all indicative of a juror who has a preconceived idea about this case and about the guilt of the accused, ignoring the Court's pre-trial instruction not to form any conclusion until all the evidence was heard. The juror is a haunting example that "evidence of inflammatory, prejudicial pretrial publicity that [has so invaded or saturated] the community as to render virtually impossible a fair trial by an impartial jury ..." Mayola v. Alabama, 623 F.2d 992, 997 (5th Cir. 1980), *quoting* United States v. Capo, 595 F.2d 1086, 1090 (5th Cir. 1979), *cert. denied*, 444 U.S. 1012 (1980)). The SJC's conclusion regarding actual juror bias was an unreasonable application of clearly established federal law and its conclusion that the record "contains no suggestion that the jury members were less than fair and impartial" is an "unreasonable determination of the facts." 28 U.S.C. § 2254(d)(2).

**II  PROSECUTORIAL MISCONDUCT IN COMMENTING ON MORALES'S FAILURE TO TESTIFY DEPRIVED MORALES OF HIS CONSTITUTIONAL RIGHT TO REMAIN SILENT.**

The MRR recommendation that the Petition should be denied with respect to prosecutorial comment on the Petitioner's right to silence should be rejected by this Court. The most egregious error that a prosecutor can make is to comment on the failure of the defendant to take the stand and testify at trial. Blumenson, Criminal Defense, § 35.3A (1990). Such action completely compromises the defendant's constitutional right to remain silent and is impermissible. Griffin v. California, 380 U.S. 609, 615 (1965). Indeed, the rule in the First Circuit Court of Appeals is that comment on the defendant's failure to take the stand is "prejudicial as a matter of law" unless the judge interrupts the argument, instructs the jury fully on the defendant's right not to testify and the jury's obligation not to draw adverse inferences, and in addition state that the U.S. Attorney was guilty of misconduct. United States v. Flannery, 451 F.2d 880, 882 (1st. Cir. 1971).

Here, in closing, the prosecutor argued that "[I]f it was self-defense, you would think he would want to tell the truth about how the shooting actually happened. If he's acting in self-defense, then isn't he ... going to want to say the truth about how the shooting happened?" This is not a mere claim that some evidence was "uncontested" or "unrebutted." The prosecutor

21

is, in essence, saying to the jury, "If you were to believe that this was really self-defense, he would have testified. So, don't believe it." The prosecuting attorney "is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done." Berger v. United States, 295 U.S. 78, 88 (1935). It is further true that "the average jury, in a greater or less degree, has confidence that these obligations . . . will be faithfully observed. Consequently, improper suggestions, insinuations and, especially, assertions of personal knowledge are apt to carry much weight against the accused when they should properly carry none." Id.

The SJC's conclusion that the prosecutor's argument was not a comment on the Petitioner's silence, but rather a permissible suggestion that the Petitioner's self-defense theory was a later contrivance, fails to account for the actual words used by the prosecutor in closing. The SJC misinterpreted the record and unreasonably applied clearly established federal law, depriving the Petitioner of his constitutional right to silence.

22

III. MORALES WAS DENIED HIS CONSTITUTIONAL RIGHT TO PUT FORWARD A DEFENSE, SELF-DEFENSE, (A) WHERE THE COURT REFUSED TO ASK THE POTENTIAL JURORS IN VOIR DIRE THEIR WILLINGNESS TO ACCEPT SELF-DEFENSE, (B) WHERE THE PROSECUTOR VOUCHED FOR HIS WITNESS ON THIS ISSUE, AND (C) WHERE A MISTRIAL SHOULD HAVE BEEN DECLARED WHEN A WITNESS'S IMPROPER TESTIMONY STRUCK AT THE HEART OF THE ISSUE OF SELF-DEFENSE.

Morales's entire case was based on self-defense. In closing, counsel argued, "Eddie Morales was being chased by a man in a white car, a 3500 pound dangerous weapon... When he turned and shot at that car, he was only defending himself." But, Morales was denied his constitutional right to due process of law and a fair trial because he was precluded from effectively presenting the issue of self-defense. U.S. Const. amend. V and XIV; United States v. Neal, 36 F.3d 1190, 1196 (1st Cir. 1994).

A.   The Court Refused to ask Potential Jurors in Voir Dire their Willingness to Accept the Theory of Self-Defense.

Defense counsel requested that the jurors be questioned regarding their willingness or ability to accept self-defense, but the Court refused to so question, and defense counsel objected.

Notwithstanding that the trial court has broad discretion to determine whether to question potential jury members regarding a particular issue, here that discretion was abused. The questions requested by defense counsel inquiring about self-defense were open-ended and would have elicited more than a one-word answer from jurors: "Have any of you ever found it necessary to defend yourself from physical harm? What have you been taught while

23

growing up about self-defense?" Prospective jurors' answers to those probing questions would have provided much more insight than the leading questions asked by the Court, such as "Are you aware of the of the killing of Officer DiNapoli?" Moreover, where Morales's two confessions were repeatedly reported in the newspapers and on television and where 100% of the sitting jury was aware of the news reports, the Court's refusal to probe the issue of self-defense was an abuse of discretion.

The Petitioner objects to the MRR with respect to the *voir dire* argument because the SJC's deferral to the trial court's discretion was a violation of Morales's constitutional right to due process of law, a fair trial, and the right to present the issue of self-defense. U.S. Const. amend. V and XIV; United States v. Neal, 36 F.3d 1190, 1196 (1st Cir. 1994).

B.   The District Attorney Vouched for his Witness on this Issue.

After Trooper Murphy choked up and was unable to read Morales's statement, the District Attorney asked if he could read the statement to the jury. At first the Court agreed to allow the District Attorney to read the statement, but defense counsel objected, arguing that it would be a "not so subtle imprimatur on the statement" of witness-vouching. However, the Court allowed the District Attorney to read the statement, which included the crucial line, "I thought it was a cop, so I started running." The issue of Morales's knowledge as to whether the person in the

24

car was a police officer was the most contested issue at trial because his first statement to the Scranton police differed from the statement to the Massachusetts troopers:  "I am sorry for what happened.  I didn't know he was a cop.  It was the first time I had a gun in my hand, and if I have to pay ... pay with my life, I will to give a little compassion to the family.  I just got nervous."

It is improper for a prosecutor to make an argument that "places the 'prestige of the government behind a witness by making personal assurances about the witness' credibility.' " United States v. Cruz-Kuilan, 75 F.3d 59, 62 (1st Cir.1996) (quoting United States v. Neal, 36 F.3d 1190, 1207 (1st Cir.1994)).  Here, the Court's allowing the District Attorney himself to read the statement, when various other means were available to introduce it as evidence, constituted witness vouching.  The statement was presented as though the government and all of its investigatory powers were behind the statement, thereby adding an unjustified authenticity to the statement which should not have been allowed.  In short, when Morales's two contradictory statements are balanced, the District Attorney's reading the incriminating statement to the jury tipped the scale of justice against the Defendant.  The MRR's finding that the SJC's deferral to the discretion of the trial court on this issue must be rejected where the prosecutor improperly imposed the

25

"imprimatur of the Government" upon the statement. See <u>United States v. Young</u>, 470 U.S. 1, 18-19 (1985).

B. <u>A Mistrial Should Have been Declared when a Witness's Improper Testimony Struck at the Heart of the Issue of Self-Defense</u>.

Gilberto Febus testified that he watched Morales fire the shots. Then he inappropriately testified, "Honestly, the police officer have [sic] no chance to react." Defense counsel's objection was sustained, and the jury was instructed to disregard that answer.

Defense counsel, however, should have moved for a mistrial which should have been allowed. Morales was denied his Sixth Amendment guarantee of effective assistance of counsel because trial counsel's failure to move for a mistrial was behavior which fell measurably below that which might be expected from the ordinary fallible lawyer and that failure resulted in prejudice. <u>Strickland v. Washington</u>, 477 U.S. 668 (1984). The witness's answer put before the jury struck at the very heart of the defense theory, self-defense. And, once the answer was spoken and heard by the jury, no instruction could have eradicated it from their minds.

The SJC's conclusion that counsel's strategy was not manifestly unreasonable where a request for a mistrial "probably would have been futile and ... [unnecessary given] the judge's forceful instruction" to the jury to disregard the testimony.

26

However, under Strickland v. Washington, 477 U.S. 668 (1984), counsel's failure to move for a mistrial was behavior which fell measurably below that which might be expected from the ordinary fallible lawyer because the request was so elementary and failure to make the request resulted in prejudice in that the mistrial could not have been granted.

IV  MORALES WAS DENIED HIS FEDERAL AND CONSTITUTIONAL RIGHT TO A FAIR TRIAL WHERE (A) THE POLICE PUT DEFENSE WITNESSES IN FEAR; (B) WHERE, IN THIS EMOTIONALLY CHARGED TRIAL, THE MEDIA PUBLISHED THE NAMES AND PHOTOGRAPHS OF THE JURORS PRIOR TO TRIAL, THEREBY INCREASING THE PRESSURE FROM THE COMMUNITY TO CONVICT, AND (C) WHERE THE COURT ADMITTED MORALES'S THREATS TO KILL ANOTHER PERSON.

The Fifth, Sixth, and Fourteenth Amendments guarantee Morales's constitutional rights to due process of law and to a fair trial. United States v. Baronne, 114 F.3d 1284, 1304 (1st Cir. 1997). Here, Morales was denied his constitutional right to a fair trial where (A) the police put his potential witnesses in fear; (B) where the media published photographs of the jurors prior to trial, thereby increasing the pressure from the community to convict;[6] and (C) where the Court admitted alleged threats by Morales to kill another person.

A.   The Witnesses were Intimidated and Afraid to Testify.

Pre-trial, defense counsel raised the issue of witness tampering. Defense counsel informed the Court that two different defense witnesses had told his investigator that the District

---

[6]   This argument is set out *supra* in Section I.

27

Attorney's office told them that they were "excused" and did not have to come to court, regardless of a subpoena. One of the defense witnesses received death threats. The state police actually stopped defense investigation by taking a witness out of his house *in the middle of defense questioning*, after which the witness refused to answer defense questions, refused to talk to the defense investigator, and refused to answer telephone calls or the door. Had the Defendant used such tactics with Commonwealth witnesses, he would surely have been charged with intimidation of a witness. But yet, the Court refused to do anything about the blatant witness tampering: "I'm not going to referee this without an evidentiary hearing, and I don't want to have an evidentiary hearing on the point."

Moreover, on the fifth day of trial, the Defendant and the Commonwealth jointly moved to impound the witness list under Rule 8 of the Uniform Rules of Impoundment "based upon a concern for the safety and the physical and mental well-being of the individuals who are named on the witness list." Attorney Kevin Murphy on behalf of the media opposed the joint motion to impound. Defense counsel argued that the witnesses "live in the community where these charges arose" and that the witnesses had expressed concern for their safety and well-being. The Court denied the joint motion to impound the witness list.

The SJC determined that the "incident was fully explored by

28

counsel on cross-examination" of the witness and so the police did not interfere with the Petitioner's right to present a defense. However, the Sixth Amendment guarantees a defendant the right to put forward a defense with witnesses. The Trial Court's ignoring the witness intimidation issue and its denial of the motion to impound, which subjected the witnesses to fear for their well-being, deprived Morales of his right to put on a defense and to a fair trial. U.S. Const. amend VI. The MRR should not be accepted on this point.

B. <u>The Court Admitted Alleged Threats by Morales to Kill a Person</u>.

At the end of day six, the parties discussed the request by the Commonwealth to admit a translation of a telephone conversation from prison between Morales and his girlfriend in which he stated that he would kill "Flako" (Hector Cabrerra). Although the Court initially stated, "It's too prejudicial for me to accept even appreciating the consciousness of guilt issue," the next morning, the judge changed his mind and agreed to allow the admission of the statement.

The MRR correctly stated that courts may properly admit evidence of threats to kill a potential witness to demonstrate consciousness of guilt, but in this case, Morales made the statement, not because he intended to kill a witness, but because he believed that his former friend, Flako, had "snitched" on him. Therefore, it was not offered at all for consciousness of guilt

29

but only to portray Morales as a ruthless killer intent upon killing again. Moreover, the statement was made from prison, so Morales in reality was wholly incapable of acting on this hollow threat. The statement, thus, was irrelevant, and it was highly prejudicial and inflammatory. The trial court's first instincts were correct: it should have been excluded, and the SJC denied the Petitioner his constitutional right to a fair trial by so upholding.

## CONCLUSION

For all the foregoing reasons, the Court should reject the MRR, grant Eddie Morales a writ of habeas corpus, and immediately discharge him from the custody of the Respondent.

Respectfully submitted,

Janet H. Pumphrey
45 Walker Street
Lenox, MA 01240
(413) 637-2777
BBO 556424

## CERTIFICATE OF SERVICE

I, Janet H. Pumphrey, hereby certify that a true copy of the above document was served on AAG Daniel I. Smulow, Esq. Attorney General's Office, One Ashburton Place, Boston, MA 02108 by mail.

Janet H. Pumphrey

October 25, 2005

30